**Irma CLARK et al., Plaintiffs-Appellants,**

v.

**Lon MANN et al., Defendants-Appellees.**

**No. 76–1022.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1976.

Decided Aug. 31, 1977.

Henry L. Jones, Jr., John W. Walker, Walker, Kaplan & Mays, P. A., Little Rock, Ark., for appellants; Jack Greenberg, James M. Nabrit, III, and James C. Gray, Jr., New York City, on appendix and on brief.

Jimason J. Daggett, Daggett, Daggett & Van Dover, Marianna, Ark., made argument for appellees; Daddridge M. Daggett, Marianna, Ark., on appendix.

Before HEANEY and ROSS, Circuit Judges, and VAN PELT, Senior United States District Judge.*

ROSS, Circuit Judge.

This appeal arises out of a civil rights action brought pursuant to 42 U.S.C. § 1983 against various officials of the Marianna, Arkansas School District. Plaintiffs, a number of black teachers and administra-

* Robert Van Pelt, Senior United States District Judge, District of Nebraska, sitting by designation.

tors presently or formerly employed by the Marianna District, challenged various District policies, practices and actions relating to teacher recruitment, retention, promotion and salaries as being violative of equal protection, due process and the first amendment. They sought injunctive relief and back pay. Following a trial on the merits, the district court denied relief in all respects. On appeal, plaintiffs raise numerous challenges to the district court's findings of fact and conclusions of law.

## I.

The Marianna School District encompasses the entire geographical area of Lee County, Arkansas. Included within its boundaries are the city of Marianna and a number of rural areas. During the 1974–75 school year, the District had an enrollment of approximately 4,800 students and employed approximately 250 teachers.

Prior to the 1970–71 school year, Marianna operated dual school systems racially segregated as to both faculty and students. During part of this period the District also maintained dual salary structures whereby black teachers and administrators were paid less than their white counterparts.

In 1970–71, Marianna commenced operation as a unified desegregated school district. Its first year of operation as a unified district was relatively uneventful. During the latter half of the following year, however, racial tensions erupted. On January 13, 1972, a sizeable group of black students at Lee High School staged a protest against what they perceived to be preferential treatment being accorded white students. The protest resulted in a number of the students being beaten and arrested. Thereafter, black students in the Marianna District engaged in a massive boycott of classes, which lasted for the remainder of the semester. At one time or another, 85 to 90 percent of the black students participated. The boycott also engendered a boycott of white businesses in Marianna by

school segments of the black population. Finally, the period in question was marked by various acts of violence directed at both whites and blacks.

At the close of the 1971–72 school year, there was substantial turnover in the Marianna teaching staff. The school board voted to not renew the contracts of ten teachers, eight of whom were black. A number of other teachers, both white and black, left the District of their own accord.

On June 8, 1973, six black teachers[1] whose contracts were not renewed at the close of the 1971–72 school year commenced the instant litigation as a class action pursuant to 42 U.S.C. § 1983. Named as defendants were Lon Mann, President of the Marianna School Board; Bob McGinnis, Secretary of the School Board; and Everett Kelly, Superintendent of the Marianna Schools. Plaintiffs alleged that their terminations were motivated by racial considerations and by their support of the boycott, and that their dismissals thus denied them equal protection and infringed their first amendment rights. They further alleged that the defendants had engaged in racial discrimination with respect to teacher recruitment, promotion and salaries. Plaintiffs later raised the additional contention that failure to afford them pretermination hearings denied them procedural due process. They sought reinstatement, back pay, and various forms of injunctive relief.

The case was tried to the district court, sitting without a jury. Each side produced substantial testimonial and documentary evidence. During trial, the court indicated that the applicable period of limitations was five years. Pursuant to an apparent stipulation by plaintiffs' counsel, the court also ruled that the class of plaintiffs would be limited to the named plaintiffs and those who testified at trial. Following the conclusion of trial, the district court ruled that plaintiffs had failed to sustain their burden of proof on any of their allegations. Specifically, the court found that the termina-

---

1. Irma Clark, Lula Tyler, Robindale Robinson, Douglas Fears, York Wilburn, and Bob Cain. York Wilburn later withdrew.

tions of teachers in question were not motivated by racial or other unconstitutional considerations; that the school board's failure to afford the terminated teachers pre-termination hearings did not deny them due process; and that the evidence failed to establish discrimination against black teachers and administrators with respect to salary, promotions or working conditions. The court further stated:

> The School District has, by direction of the Court, modified its policies of salary schedule to include schedule of pay for administrative and specialty employment and has established objective criteria for filling vacancies,. assignment of teachers and other employees, promotion and other employment practices in the operation of the Marianna Schools. The Court, therefore, concludes that even though the School System operated a completely segreated [sic] school prior to 1970, the school policies toward a fully integrated system has, prior to the trial of the case, been brought into compliance making it unnecessary for an injunction to be issued pursuant to 28 U.S.C. § 2201.

Accordingly, judgment was entered for the defendants. Plaintiffs appealed.

On appeal, plaintiffs challenge the district court's findings that the School District's employment practices were not racially discriminatory, that plaintiffs were not denied due process, and that the refusal to renew their contracts was not motivated by unconstitutional considerations. With respect to the last claim, plaintiffs further contend that the district court improperly allocated the burden of proof and employed an erroneous standard of proof. Finally, plaintiffs attack the court's ruling as to the definition of the class. Defendants take issue with the district court only on the statute of limitations question. They argue that the applicable limitations period is three years.

## II.

We first address the threshold questions pertaining to the definition of the class and the statute of limitations.

### A. Class action

As noted above, this action was brought as a class action on behalf of all black teachers and potential teachers in the Marianna School District. At the conclusion of trial, the district court limited the class to those who were named plaintiffs or who testified at trial, believing that plaintiffs' counsel had stipulated thereto. Plaintiffs now contend that the court's limitation of the class was the product of a misunderstanding between plaintiffs' counsel and the court, and that the class should be viewed as encompassing the broader group which plaintiffs purported to represent in their complaint.

The stipulation relied on by the district court arose out of the following colloquy between the court and plaintiffs' counsel, which occurred at the conclusion of the trial:

> THE COURT: Do I understand that the only ones that are in contention here for any claimed relief are those names who have been—of course, those who are a part of the proceedings and named plaintiffs in the case and those other who are not named plaintiffs who have testified and the claim has been made for this particular record?
>
> MR. JONES: That's right.
>
> THE COURT: And you are not claiming for anybody else outside of those?
>
> MR. JONES: No.
>
> THE COURT: Well, narrow it down to that, then. So keep that in mind.

Plaintiffs contend that this interchange occurred in the context of a discussion over the issues to be covered in post trial briefs, after the court had stated that the only issues it saw were whether the dismissed teachers were terminated for racial reasons and without being afforded due process. On that basis, plaintiffs maintain that they agreed to limit the class only with respect to the issues of racially motivated discharges and due process.

■ In view of the unrestricted language employed by both the court and plaintiffs'

counsel in discussing the class issue, we cannot agree that plaintiffs' stipulation was limited only to certain claims for relief. If there was a misunderstanding, the responsibility therefor rests with plaintiffs. Accordingly, we hold that the class of plaintiffs is limited to the named plaintiffs: Irma Clark, Lula Tyler, Robindale Robinson, Douglas Fears and Bob Cain;[2] two other black teachers whose contracts were not renewed and who testified at trial: Rebecca Fears and Gladine Gregory; and three black present or former administrators in the Marianna District who also testified: Emma Davis, A. L. Johnson and Larthell Young. Davis and Young, at the time of trial, were still employed at Marianna. Johnson resigned at the end of the 1971–72 school year.

This determination is, of course, without prejudice to the right of other members of this or any other class to initiate a new action if they see fit.

## B. Statute of Limitations

■ During trial, the district court ruled that this case would be governed by a five-year statute of limitations; however, the need for a formal ruling on that point at the conclusion of trial was obviated by the court's finding that plaintiffs had failed to prove their claims. On appeal, defendants contend that the proper period of limitations is three years, and that we should therefore confine the granting of any relief to the period beginning on June 8, 1970.[3]

■ Federal law does not provide a specified limitations period for actions brought pursuant to 42 U.S.C. § 1983. The timeliness of such actions is determined by applying the most analogous limitations provision of the law of the relevant state, which, in the instant case, is Arkansas. See, e. g., O'Sullivan v. Felix, 233 U.S. 318, 34 S.Ct. 596, 58 L.Ed. 980 (1914); Chambers v. Omaha Public School Dist., 536 F.2d 222, 225

(8th Cir. 1976); Warren v. Norman Realty Co., 513 F.2d 730, 733 (8th Cir. 1975).

Where state law reflects a limitations provision which is directly analogous to the federal claim in question, we have encountered little difficulty in selecting the appropriate statute of limitations. Thus, in Chambers v. Omaha Public School Dist., supra, 536 F.2d 222, a case in which a former school guidance counselor alleged that he was dismissed because of his race and his exercise of first amendment rights, we applied the Nebraska limitations provision applicable to actions upon a liability created by a federal statute. In Warren v. Norman Realty Co., supra, 513 F.2d 730, a civil rights action alleging housing discrimination based on race, we applied the Nebraska limitations provision governing housing discrimination suits brought under state law. See also Peterson v. Fink, 515 F.2d 815 (8th Cir. 1975).

Where, however, a more attenuated analogy is required, neither this court nor the federal courts in general have adhered to a uniform approach. In some instances we have looked to the nature of the defendant's conduct, and have applied the state limitations provision applicable to tort actions based on similar conduct. Johnson v. Dailey, 479 F.2d 86, 88 (8th Cir.), cert. denied, 414 U.S. 1009, 94 S.Ct. 371, 38 L.Ed.2d 246 (1973); Savage v. United States, 450 F.2d 449, 451 (8th Cir. 1971), cert. denied, 405 U.S. 1043, 92 S.Ct. 1327, 31 L.Ed.2d 585 (1972). In an earlier case, however, we focused on the nature of a civil rights suit as a statutory cause of action, and held that a civil rights action predicated on an assault by a police officer would be governed by either the limitations provision for actions based on a liability created by statute, or by the general provision applicable to actions not otherwise provided for. Glasscoe v. Ho-

---

**2.** See note 1, supra.

**3.** Plaintiffs argue that defendants are barred from asserting this claim by their failure to file a cross-appeal. We disagree. The defendants do not seek to alter or modify the district court's judgment, but only to sustain it on grounds other than those relied on by the court below. A cross-appeal need not be filed under those circumstances. See 9 J. MOORE, Federal Practice ¶ 204.11[3], at 933 (1975).

*well,* 431 F.2d 863 (8th Cir. 1970). *See generally Chambers v. Omaha Public School Dist., supra,* 536 F.2d 222; *Reed v. Hutto,* 486 F.2d 534 (8th Cir. 1973).

In applying the five-year period of limitations, the district court apparently relied on either Ark.Stat.Ann. § 37–209, which governs actions on written contracts, *Allen v. Amalgamated Transit Union Local 788,* 554 F.2d 876, 880 (8th Cir. 1977), or on Ark.Stat. Ann. § 37–213, which governs all actions not provided for in other limitations provisions. Defendants contend that the court should have applied the three-year period embodied in Ark.Stat.Ann. § 37–206, which governs all actions founded on any contract or liability, express or implied, and which has been construed to cover actions based upon a liability created by statute. *See Reed v. Hutto, supra,* 486 F.2d at 536; *McDonald v. Mueller,* 123 Ark. 226, 183 S.W. 751, 753 (1916); *Nebraska National Bank v. Walsh,* 68 Ark. 433, 59 S.W. 952, 954 (1900).

■ The substance of plaintiffs' cause of action is alleged deprivations of due process, equal protection and first amendment rights arising out of school district personnel policies and practices. We find no analogy between such an action and one predicated upon a written contract. Accordingly, we reject application of the five-year limitations provision embodied in § 37–209. Since a § 1983 action is one to enforce a liability created by statute, we do find an analogy between the instant case and actions governed by § 37–206. That being the case, we reject application of the more general catchall provision embodied in § 37–209. It appears, then, that the only Arkansas statute of limitations analogous to the instant case is § 37–206. Accordingly, we are not called upon to resolve the conflict in approaches manifested in *Johnson* and *Savage* on the one hand, and *Glasscoe* on the other. We hold that the appropriate period of limitations is three years.

4. In their complaint and at trial, plaintiffs also alleged that the defendants engaged in racial discrimination with respect to the recruitment

## III.

Having defined the class of plaintiffs and the time period in question, we turn to a review of plaintiffs' claims that the defendants followed racially discriminatory employment and pay practices.

■ We note at the outset that, in order to prevail, plaintiffs must establish racially discriminatory intent or purpose; a mere showing of discriminatory effect is not enough. The latter showing is sufficient to establish a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Where, as here, however, the claim is unconstitutional racial discrimination, the Supreme Court has recently held that discriminatory intent or purpose must be shown. *See Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). *See also Firefighters Institute for Racial Equality v. City of St. Louis,* 549 F.2d 506, 510 (8th Cir. 1977). As the Court stated in *Arlington Heights v. Metropolitan Housing Development Corp., supra,* 45 U.S.L.W. at 4077:

> Our decision last Term in *Washington v. Davis,* 426 U.S. 229 [96 S.Ct. 2040, 48 L.Ed.2d 597] (1976), made it clear that official action will not be held unconstitutional *solely* because it results in a racially disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Id.,* at 242 [96 S.Ct. 2040]. Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. (Emphasis supplied.)

Plaintiffs' complaints centered around recruitment for administrative and specialty positions, promotion of Marianna teachers to such positions, and the District's salary practices.[4] The district court found no discrimination in these areas. Plaintiffs contend that this finding is clearly erroneous, and that they are entitled to both remedial and prospective relief.

and hiring of teachers; however, they do not appear to press this claim on appeal.

■ With respect to recruitment and promotion, there is some evidence in the record that whites were hired for administrative and specialty positions without affording blacks notice and an opportunity to apply, that objective hiring criteria were not utilized, and that certain blacks were passed over for promotions in favor of less qualified whites. It does not appear, however, that any of the seven teacher plaintiffs sought or was qualified for any of the positions filled in the aforesaid manner. As to the three remaining administrator plaintiffs, two of them, Emma Davis and Larthell Young, testified that they did not believe that they had been discriminated against and disclaimed any interest in recovering damages. Accordingly, we hold that the district court properly declined to award relief relating to promotions to these individual plaintiffs.

The remaining plaintiff excepted from our discussion above is A. L. Johnson, a former Marianna administrator. Plaintiffs contend that Johnson was passed over for promotion to the principalship of Lee High School, the unified high school, because of his race.

Prior to unification, Johnson was the principal of the black Marianna high school. He had a Masters degree and was certified as a principal. During 1970–71, the first year of unification, Johnson declined an offer to become assistant principal at Lee, and instead served as principal of the consolidated junior high school. During the summer preceding the 1971–72 school year, Johnson accepted the assistant principalship at Lee. Shortly thereafter, however, he was appointed assistant superintendent, and served in that capacity during 1971–72. Johnson was never offered the principalship at Lee. He left Marianna voluntarily after 1971–72. In 1970–71, Johnson was paid $9,600. In 1971–72, he was paid $10,500.

From 1969–70 through 1971–72, the principal at Lee High School was Bob Blankenship, a white. Blankenship completed the requirements for his Masters degree sometime during the 1971–72 school year, and, prior to that, was not certified as a principal. Blankenship was paid $9,500 during 1970–71 and $11,400 in 1971–72. At trial, Dr. Henry C. Dial, the Marianna Superintendent of Schools during 1971–72, conceded that Johnson was more qualified than Blankenship in terms of education and certification. Lon Mann, president of the school board during that period, testified that racial considerations were a factor in making Blankenship the principal at Lee over Johnson.

■ Based on the foregoing, we think the evidence clearly shows that the defendants' appointment of Blankenship over Johnson to the principalship at Lee during 1970–71 and 1971–72 was racially discriminatory. In view of the salary differentials involved, we are not persuaded that Johnson's promotion to assistant superintendent in 1971–72 precludes a finding of discrimination. We hold that Johnson is entitled to recover the difference between the salary he received in 1970–71 and 1971–72, and the salary he would have received during those years had he been the principal at Lee.[5]

■ As to the question of whether the district court erred in declining to grant prospective injunctive relief with respect to the defendants' recruitment and promotion policies, we are doubtful that this issue is properly a part of this case. Only Young and Davis are presently employed by Marianna, and none of the other plaintiffs appears to be a candidate for employment at the administrative or specialty level. Accordingly, we find no basis for upsetting

---

5. Johnson does not seek any other form of relief. As noted above, he is no longer employed by Marianna.

The starting point for computing Johnson's damages is a comparison of his salary with Blankenship's. On that basis, Johnson would be entitled to no additional compensation for 1970–71, and to $900 for 1971–72. Johnson may be entitled to a greater sum, however, if, under Marianna's pay schedules, he would have been paid a higher salary than Blankenship as principal of Lee based on his education and experience.

the district court's refusal to award prospective relief as to these claims.

■ Regarding pay practices, plaintiffs contend that the defendants followed a policy of paying blacks less than whites for comparable services on the basis of race. Such allegations, if proven, are sufficient to establish a violation of the equal protection clause. *Arkansas Ed. Ass'n v. Board of Ed., Portland, Ark. School Dist.,* 446 F.2d 763, 769 (8th Cir. 1971). We conclude, however, that the district court's finding that defendants did not discriminate with respect to salaries (except for Johnson, *supra*) is supported by the record. Much of the evidence proffered by plaintiffs on this point concerns years for which claims are barred by the statute of limitations and parties other than the plaintiffs involved in this case. As such, it is of limited relevance. Our review of the record discloses that since 1970–71 Marianna has followed a racially neutral salary schedule, based on education, experience and responsibility, at least as it relates to this class of plaintiffs.

**6.** Ark.Stat.Ann. § 80–1304(b) provides in pertinent part:

Every contract of employment hereafter made between a teacher and a board of school directors shall be renewed in writing on the same terms and for the same salary, unless increased or decreased by law, for the school year next succeeding the date of termination fixed therein, which renewal may be made by indorsement on the existing contract instrument; unless during the period of such contract or within ten (10) days after the termination of said school term, the teacher shall be notified by the school board in writing delivered in person or mailed to him or her at last and usual known address by registered mail that such contract will not be renewed for such succeeding year, or unless the teacher during the period of the contract or within ten (10) days after close of school shall deliver or mail by registered mail to such board his or her written resignation as such teacher, or unless such contract is superseded by another contract between the parties. Provided that no contract for the succeeding school year shall be entered into between the school board and any person prior to the beginning of the second semester of the current school year. If a teacher quits or refuses to teach in accordance with his of her contract without just cause, he or she is hereby prohibited from teaching elsewhere during the time for which he or she had been employed.

## IV.

We turn next to the individual claims of the seven plaintiffs whose teaching contracts were not renewed at the end of the 1971–72 school year. Those plaintiffs alleged that they were denied procedural due process, and were terminated for constitutionally impermissible reasons.

### A. Due Process

Arkansas law does not clothe public school teachers with formal tenure. Rather, it establishes a "continuing contract" system, whereby each teacher's annual contract is automatically renewed absent some affirmative action by the school board. Ark.Stat.Ann. § 80–1304(b).[6] In the event the board decides not to renew a teacher's contract, Arkansas statutes further provide that the terminated teacher shall be afforded written notice, and may, upon request, obtain a statement of reasons and a hearing before the school board. Ark.Stat.Ann. §§ 80–1245 and 80–1246.[7] *See generally Cato v. Collins,* 539 F.2d 656 (8th Cir. 1976).

**7.** Ark.Stat.Ann. § 80–1245 provides:

80–1245. *Method of termination or dismissal of teacher—Decision not to renew contract.*—When a local school board terminates or dismisses a teacher, the board shall notify the teacher in writing, and if the board determines not to renew the contract of a teacher for another academic year, it shall notify the teacher thereof in the manner and within the time prescribed by § 80–1304, Ark. Stats. The board may include with such notice a statement of the reasons for such termination or dismissal, or for the determination not to renew the contract of the teacher. If the board does not include such statement with the notice, the teacher may file a written request with the board within ten (10) days after receipt of the notice from the board, for a statement of the reasons of the board for such dismissal, termination or refusal to renew the contract. Upon receipt of such request in writing, the board shall, within five (5) days after receipt of the request, furnish to the teacher a written statement of the reasons for such dismissal or termination or decision not to renew the contract of the teacher.

Ark.Stat.Ann. § 80–1246 provides:

80–1246. *Request for and conduct of hearing relative to termination or dismissal of teacher.*—Any teacher who is dismissed or terminated, or whose contract is not renewed for the next academic year, and who is noti-

Plaintiffs do not seriously contend that the defendants failed to comply with the statutory procedures set forth above.[8] They assert instead that they were entitled to full due process hearings, and that the statutory hearings did not meet the requisites of due process in that they were held after the initial nonrenewal decisions were made, and because the school board was not an impartial tribunal. The district court found no denial of due process.

It is well settled that a terminated nontenured public school teacher is entitled to a due process hearing only if the termination deprives the teacher of an interest in liberty or property. *See Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Cato v. Collins, supra,* 539 F.2d at 659; *Brouillette v. Board of Directors,* 519 F.2d 126, 127 (8th Cir. 1975); *Buhr v.*

*Buffalo Public School Dist. No. 38,* 509 F.2d 1196, 1199 (8th Cir. 1974). In *Cato v. Collins, supra,* 539 F.2d 656, we held that Arkansas' "continuing contract" system does not give rise to an expectation of continued reemployment such that a teacher has a constitutionally protected property interest in reemployment. Accordingly, plaintiffs were entitled to due process hearings only if they can establish that their terminations deprived them of an interest in liberty.[9]

We have stated that:

Deprivation of an interest in liberty occurs where nonretention of the teacher imposes upon him a stigma or other disability foreclosing his future employment opportunities or resulting in significant damage to his standing and associations in the community.

*Buhr v. Buffalo Public School Dist. No. 38, supra,* 509 F.2d at 1199, *quoted with approval in Cato v. Collins, supra,* 539 F.2d at

---

fied thereof by the school board in the manner prescribed by law, may file a written request with the board for a hearing. Such written request for a hearing shall be sent by certified mail to the president of the school board, with a copy to the superintendent, within thirty (30) days after the written notice of dismissal or termination of contract is received by the teacher.

The hearing before the school board shall be conducted in accordance with the following provisions:

(a) The hearing shall take place not less than five (5), nor more than ten (10) days after the written request therefor has been served on the school board, except that the teacher and the school board may, in writing, agree to a postponement of such hearing to a date agreed to by the school board and the teacher.

(b) The hearing shall be private unless the school board or the teacher shall request that the hearing be public, in which case a public hearing shall be held at the request of the school board or the teacher.

(c) The teacher and the school board may be represented by legal counsel.

(d) It shall not be necessary that a full record of the proceedings at the hearing be made and preserved unless:

(1) The school board shall elect to make and preserve a record of the hearing, at its own expense, in which event a copy thereof shall be furnished the teacher, upon request, without cost to the teacher,

(2) A request is filed with the school board by the teacher in writing at least 24 hours

prior to the time set for the hearing, in which event the school board shall make and preserve, at its own expense, a record of the hearing, and shall furnish a copy thereof to the teacher without cost to the teacher.

8. Plaintiffs concede that the statutory procedures were followed with respect to six of the dismissed teachers, and it appears that at least five of them were given post termination hearings. As to the seventh plaintiff, Gladine Gregory, there is some dispute as to whether she was afforded her full statutory rights. The district court, however, found that Gregory waived her right to a hearing, and that finding is supported by the record. Moreover, Gregory admitted at trial that she received written notice of her termination and her right to a hearing.

9. The circumstances relating to Douglas Fears differ from those of the other plaintiffs. Fears was dismissed with two or three weeks remaining on his contract. *See* discussion in Part IV–B of the text, *infra.* Accordingly, it is arguable that he was deprived of a property interest protected by due process. Plaintiffs, however, do not contend that Fears should be treated differently from the other plaintiffs with respect to their due process claim, and the record is silent as to whether Fears was afforded a due process hearing or an opportunity therefor. Accordingly, the present record affords no basis for holding that Fears was denied due process.

659. Thus, where derogatory reasons for nonrenewal are incorporated into a record made available to a prospective employer or are publicly announced, the teacher may be said to have been deprived of an interest in liberty. *Cato v. Collins, supra,* 539 F.2d at 660; *Buhr v. Buffalo Public School Dist. No. 38, supra,* 509 F.2d at 1199. It is important to note, however, that where the reasons for nonrenewal become public information solely by way of a public hearing held at the behest of the teacher, such disclosure cannot form the basis for a deprivation of the teacher's interest in liberty. *Cato v. Collins, supra,* 539 F.2d 656. *See Churchwell v. United States,* 545 F.2d 59, 62 (8th Cir. 1976).

■ The record does not establish that derogatory reasons underlying plaintiffs' terminations were incorporated into any record which would be available to prospective employers and which could thus damage their chances for future employment. Nor does it appear that the bases for their dismissals were publicly aired through any means other than the hearings held at their requests. Accordingly, we hold that plaintiffs suffered no deprivation of their interests in liberty. Having previously concluded that plaintiffs were not deprived of any property interests, we hold that they were not entitled to further due process hearings.[10]

## B. Bases for terminations

Plaintiffs alleged that their dismissals were predicated on their race and on their exercise of first amendment rights.

■ In view of plaintiffs' nontenured status, as defined by Arkansas law, they could properly be dismissed for virtually any reason or for no reason at all, except one which contravenes or is predicated on the exercise of a specific constitutional guarantee. *See Buhr v. Buffalo Public School Dist. No. 38, supra,* 509 F.2d at 1201–02. The district court recognized that ter-

minations motivated by the reasons alleged by plaintiffs would be impermissible under the first and fourteenth amendments. It found, however, that the evidence did not support plaintiffs' claims.

Plaintiffs contend that the district court employed an erroneous standard of proof, that it further erred in holding that plaintiffs retained the burden of proof throughout the trial, and that its findings are clearly erroneous. We consider these points seriatim.

### 1. Standard of proof

Plaintiffs maintain that the district court adopted the view that they must establish a constitutionally impermissible reason as the *sole* basis for their dismissals in order to prevail. They argue that they need only show that race or free speech was a factor in the nonrenewal decision, and that the district court erred in employing the more stringent sole basis standard.

■ We agree that proof of the type of claim asserted here does not require a showing that the dismissal was solely the product of a constitutionally impermissible motive. Proof that race or protected speech was a motivating factor in the decision to dismiss is sufficient. *See Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. at 563, 97 S.Ct. 555. *Cf. Williams v. Matthews Co.,* 499 F.2d 819, 826 (8th Cir. 1974). We do not read the district court's opinion, however, as employing the sole basis standard, but rather that it applied the proper standard.

■ One final point with respect to the standard of proof must be noted. While plaintiffs need not prove that an impermissible reason formed the sole basis for their dismissals in order to establish their claims, a showing falling short of that standard leaves the defendants an opportunity to escape liability by showing that the plaintiffs would have been dismissed even if the im-

---

10. In view of our above discussion, plaintiffs' further contention that the Arkansas statutes pertaining to termination of teachers are unconstitutional as applied to them is clearly without merit. *See Cato v. Collins,* 539 F.2d 656, 662 (8th Cir. 1976), in which we rejected an identical claim.

permissible factors had not been considered. *See Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. at 468, n. 21, 97 S.Ct. at 266, in which the Supreme Court stated:

Proof that the decision by the Village was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing that the same decision, would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision. * * *

### 2. Burden of proof

■■■■■ Where, as here, suit is brought pursuant to 42 U.S.C. § 1983, plaintiffs ordinarily retain the burden of proof throughout the trial. *See Arkansas Ed. Ass'n v. Board of Ed., Portland, Ark. School Dist., supra,* 446 F.2d at 770; *Smith v. Board of Ed. of Morrilton School Dist. No. 32,* 365 F.2d 770, 783 (8th Cir. 1966). In some § 1983 cases, however, involving allegations that teacher discharges were racially motivated, we have employed a shifting burden of proof concept whereby once a plaintiff establishes a prima facie case, the burden shifts to the defendants to prove an absence of discrimination.[11] *United States v. Cotton Plant School Dist. No. 1,* 479 F.2d 671 (8th Cir. 1973); *Moore v. Board of Ed. of Chidester School Dist. No. 59,* 448 F.2d 709 (8th Cir. 1971). Relying on *Chidester* and *Cotton Plant,* plaintiffs contend that they established a prima facie case, and that the district court, therefore, should have shifted the burden of proof to the defendants.

In *Chidester* we held that the burden of proof shifts to the defendants upon showing the concurrent existence of four factors:

A school district must show by "clear and convincing" proof that the dismissal of black teachers was not unlawfully discriminatory if the district has a long history of segregation, if there is a decrease in the number of black teachers, if the proportion of the black faculty to white faculty is significantly less than the proportion of black to white students, and if only black teachers are dismissed.

*Moore v. Board of Ed. of Chidester School Dist. No. 59, supra,* 448 F.2d at 711, *quoted in United States v. Cotton Plant School Dist. No. 1, supra,* 479 F.2d at 672. While it is arguable that the evidence in the instant case satisfied the first three criteria set forth in *Chidester,* plaintiffs concede that it does not meet the fourth test since white teachers were also dismissed at the close of the 1971–72 school year. They argue, nonetheless, that the tests articulated in *Chidester* were not intended to constitute the exclusive circumstances under which the burden of proof would shift, that the prima facie showing of discrimination in this case is as strong as that in *Chidester* and *Cotton Plant,* and that the burden should, therefore, have shifted.

■■■ We agree that under *Washington v. Davis, supra,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597; *Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, and *Hazelwood School Dist. v. United States,* —— U.S. ——, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), a prima facie case can be established partially by statistical proof, subject, of course, to being rebutted by the School District. We have concurrently held this to be the case in *Williams v. Anderson,* 562 F.2d 1081 (8th Cir. August 31, 1977). In this case, however, the statistical proof and other evidence does not rise to the same level as that in *Williams v. Anderson, supra,* and in our opinion does not require a hold-

---

11. The shifting burden of proof concept is often employed in cases brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See, e. g., United States v.*

*Hazelwood School Dist.,* 534 F.2d 805 (8th Cir. 1976), *vacated and remanded on other grounds,* —— U.S. ——, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

ing that a prima facie case was established which would require rebuttal by the defendants. Rather, we feel that the trial court properly placed the burden of proof on the plaintiffs.

### 3. The district court's findings

We turn, then, to a review of the district court's findings that plaintiffs' terminations were not predicated on constitutionally impermissible reasons. Before considering the circumstances pertaining to each individual plaintiff, we note certain factual and legal observations relevant to all.

First, the procedures generally employed at Marianna during 1971–72 in deciding whether or not to renew a particular teacher's contract were described at trial as follows: Each teacher was to be evaluated once each semester by his or her principal, using an evaluation form adopted by the District. The form listed 20 criteria, grouped under three headings—instructional competence, personal characteristics, and professional attitudes and growth. As to each criterion, the teacher was to be rated either outstanding, good, fair, poor or unsatisfactory. The form also provided space for comments under each criterion.[12] During the spring semester, each principal would submit a recommendation to the superintendent as to whether the contract of each teacher serving under him or her should be renewed. The superintendent would then submit recommendations to the school board, which was responsible for making the final decision. The superintendent's recommendations usually tracked those of the principals, and were generally followed by the school board. If the board voted against renewal of a contract, the teacher could obtain a hearing before the board upon request. Following the hearing, the board would vote on whether to sustain or reverse its original decision.

■ Second, the essence of plaintiffs' first amendment allegations is that they were terminated because they voiced their

opinions as to the merits of the boycott and the administration's handling of the situation. Legitimate and compelling institutional needs may sometimes justify placing some restrictions on the exercise of first amendment rights in the educational environment. *See Healy v. James,* 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Tinker v. Des Moines Independent Community School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Defendants, however, do not contend that there were circumstances which warranted precluding plaintiffs from expressing their views as to the events then transpiring, and we perceive none.

■ Third, some of the teachers hired to replace plaintiffs were black. This does not, however, foreclose a finding of racial discrimination, at least where the termination and the selection of a replacement are accomplished separately, as appears to have been the case here.

Finally, plaintiffs concede that there were black teachers in the District who supported the boycott and were rehired for the following year.

We proceed now to examine the evidence and findings as to each individual plaintiff. We review the district court's findings under the clearly erroneous standard. Fed.R. Civ.P. 52(a).

### Irma Clark

Irma Clark was first employed by the Marianna School District during the 1965–66 school year. During 1971–72 she was a girls' physical education teacher at Lee High School. Her principal was Bob Blankenship.

In December 1971 Clark received a largely favorable evaluation from Blankenship. She was rated outstanding on four criteria, good on fourteen, and fair on the remaining two. Clark testified to having a post evaluation conference with Blankenship in which he indicated that improvement was needed

---

12. At trial, both sides offered conflicting expert testimony as to the validity and objectivity of the evaluation form used at Marianna.

only in the two areas in which she was rated fair: "Promptness and accuracy with reports," and "Response to authorized policies & procedures."

As noted above, racial tensions erupted at Lee High School on January 13, 1972, precipitating a large scale boycott of classes by black students. Clark denied being a participant in the boycott, stating that only students were participants. She did testify, however, that she was a verbal supporter of the boycott. It appears that she publicly criticized the school administration's handling of the events of January 13 in a letter published in an Arkansas newspaper. Clark also had a private conference with Blankenship in which she told him that she "thought very little of him as a man for letting those kids get into that type of situation whereas [sic] people beat them and hosed them down * * * ."

Clark testified that as the boycott continued, her relationship with Blankenship, which had previously been good, cooled. Blankenship conceded that Clark's criticism annoyed him, and further stated that he viewed her public discussion of her opinion of the administration's handling of the boycott as a breach of professional ethics.

Clark's support for the boycott also drew the attention of Lon Mann, then president of the school board. Mann referred to her in a letter discussing the boycott, written in mid-February and distributed to various segments of the community. It read, in part:

> Secondly, we should recognize that the boycott is simply a tool being used by the "Concerned Citizens of Lee County" to excite Negroes enough to get them to register to vote with the ultimate aim of taking over political control of Lee County. This group has no intention of setting [sic] the boycott because it serves as the main vehicle for conversation about real, or rumored injustices to Negroes. This same group has no intention of missing any bets as far as keeping the schools from operating smoothly. They can make as much mileage out of rumors and confusion as they can out of planned disruptions. With this in mind, we should identify Olly Neal, Jr., Prentiss Neal, Rabon Cheeks, Quincy Tillman, Rev. I. V. McKenzie, Andrew Williams, Thomas Ishmael, Chester Dobson, Benjamin Anthony, Jr., Irma Jean Clark, Antonia Hobbs, Mrs. Mamie Nelson, John Lee Wilson, Rev. C. O. McClendon, Mack Henry Cleveland, Sterling King, Jr. and certain others as a political action group that is mainly interested in political domination, regardless of the cost to the community or the public schools.

On March 22, 1972, Blankenship filled out a second evaluation form on Clark, rating her significantly lower than he did in December 1971. Clark was rated good on five criteria, fair on ten, and poor on five. Blankenship attached a sheet to the evaluation form containing the following comments:

> Mrs. Clark has an excellent knowledge of her subject matter field, utilizes good teaching methods, has motivation and direction in her classes, maintains good class control and has good rapport with her students. She is a good girls physical education teacher although she is somewhat lax in consistently planning her work.
>
> In the area of professionalism, her performance over the past weeks has been poor. She has repeatedly criticized the administration for the events of January 13th both in public (an interview in the *Arkansas Gazette*) and in private (to other members of the faculty). By her own admission, these criticisms have been based on her own assumptions rather than facts. She does not accept supervision or suggestions in a professional manner, nor is her response to authorized policies and procedures good. In her relations with other school personnel, she is a "loner". I am enclosing two letters as an example of her negligence in handling her financial affairs. On two other occasions, I have answered inquiries from credit bureaus as to her present employment and location.

My inability to adequately document her professional inadequacies makes me hesitate to recommend non-renewal of her contract. However, I do feel that her activities in the 10th grade last year and her attitude toward the administration during this year have not been conducive to a good educational climate.

Clark testified that Blankenship never discussed the March evaluation with her. She further stated that she was not even aware that he had performed the second evaluation until June, and that she did not receive a copy of it until she requested one after receiving her nonrenewal notice. Finally, Clark stated that to her knowledge, Blankenship had not made any observation visits to her classes during the period from January 13 to March 22, and that her teaching methods during both semesters of the 1971–72 school year were substantially the same.

In June 1972 Clark was notified that the school board had voted not to renew her contract based on the following reasons:

1. The failure to meet your financial obligations. This condition has existed since 1968 and the district has continued to receive calls from collection agencies, plus garnishments.

2. The use of improper language with students and fellow colleagues.

3. The failure to respond to suggestions to improve areas of professional attitudes and growth, and personal characteristics over the past three years.

Clark requested and was given a hearing before the school board, at which these allegations and an additional charge that she had mishandled athletic department funds were discussed. Thereafter, the board reaffirmed its decision to not rehire Clark.

The underlying bases of the charges asserted against Clark were developed at trial. With respect to her failure to meet her financial obligations, the evidence showed that Clark's school paychecks were garnished on two occasions; that a third garnishment was threatened, but avoided when Clark paid the bill in question; and that the District received four letters and several phone calls concerning her financial obligations. It further appeared, however, that the bulk of the incidents recounted above occurred prior to the 1971–72 school year. The only incidents occurring during that year were two letters from the Arkansas Education Association concerning a single insufficient funds check. A. L. Johnson, Clark's principal during 1967–68, 1968–69 and 1969–70, testified that Clark had personal financial problems during those years. He further stated, however, that those problems did not interfere with her work.

The charges of improper language centered largely around allegations that Clark told her students to "wipe your butts," and to "douche with vinegar daily." Clark testified that she did tell her students to "wash your butts." She further stated that she advised her students to douche, but denied telling them that they should do so daily. Clark stated that she viewed the statements in question as relating to personal hygiene, and thus, to her job.

With respect to the third reason assigned by the board for Clark's nonrenewal, there is little evidence in the record as to specific suggestions for improvement directed to Clark to which she did not respond. Apparently, this charge related, at least in part, to a conference in the spring of 1971 between Clark and Dr. Dial, who had recently become the Marianna superintendent of schools. The conference was precipitated by the fact that, while Clark had received favorable evaluations from A. L. Johnson in 1967–68, 1968–69, and 1969–70, she received an unsatisfactory evaluation for 1970–71 from her principal for that year, Ronnie Austin. Austin recommended against renewing Clark's contract for 1971–72. Dial testified that he and Clark discussed various allegations made against her, including that she had men in her apartment during all hours of the night and had beer parties; that she used profanity in her classes; and that she sent students off the school grounds to buy cigarettes for her. According to Dial, Clark indicated that she would improve her behavior. Thereafter, Dial recommended that she be rehired.

The final charge against Clark was her alleged mishandling of athletic department funds. At the beginning of the school year, Clark ordered gym uniforms to be sold to her students. Clark had custody of the uniforms and was responsible for collecting the money from the students. Those unable to pay the $4.00 or $4.50 purchase price all at one time were allowed to pay in installments. Clark was responsible for turning the money collected in to the school office. Blankenship testified that he paid the supplier $1,200, but that in May 1972 an accounting of the remaining uniforms and the school's outstanding debt to the supplier disclosed a shortage of approximately $600. After looking into the matter, Clark concluded that one of the boxes of uniforms listed on the packing slip had never been received. She reported her findings to Blankenship, who in turn contacted the supplier. The supplier's records indicated that the correct number of uniforms had been shipped from the factory. Thereafter, the School District paid the shortage. No attempt to collect the money from Clark was made, and it does not appear that any further investigation or audit was conducted. Clark testified that in prior years she had sold gym uniforms in a similar manner, and had collected receipts at athletic events, all without incident.

■ The district court found that Clark's dismissal was based upon the grounds asserted by the school board, and was in no way motivated by her race or her participation in any civil rights activities. Based upon our review of the record, we deem these findings to be clearly erroneous. In view of Bob Blankenship's characterization of Clark's letter criticizing the administration as a breach of professional ethics, Lon Mann's letter of February 1972, and the suspect nature of the March 22 evaluation of Clark, we find that racial considerations and her exercise of her first amendment rights were factors in the decision not to renew her contract.

13. SOLUTION TO THE PROBLEM IN MARIANNA
 Submitted by Lula P. Tyler

We are further unable to conclude that the reasons expressly relied on by the school board would have resulted in Clark's dismissal even in the absence of any impermissible considerations. In view of the evidence developed at trial, we are not persuaded that the three grounds for dismissal set forth in the board's letter to Clark would have warranted her termination, particularly when measured against her apparent competence. We are more disturbed by the charge that Clark mishandled athletic department funds. Nevertheless, in view of the administration's failure to undertake a thorough investigation into the shortage, and the fact that the shortage was not initially offered as a basis of Clark's dismissal, we are not persuaded that Clark would have been dismissed irrespective of the impermissible considerations. We hold that the decision not to renew Clark's contract for 1972–73 violated her constitutional rights under the first and fourteenth amendments.

*Lula Tyler*

Lula Tyler was first employed by Marianna in the spring of 1967. In 1971–72 she taught ninth grade English at the Futral school. Her principal was Jerry Gatling, who is white.

Tyler was evaluated by Gatling in November 1971. He rated her good on 18 criteria, and fair on the remaining two: "Interest in and enthusiasm about teaching," and "Apparent physical health and energy." Tyler testified to having a post evaluation discussion with Gatling, in which he stated that he was satisfied and that she was doing a good job.

Tyler stated that after the inception of the boycott, Dr. Dial invited teachers to submit their views as to possible solutions to the existing problem. In response, Tyler prepared a document entitled "Solution to the Problem in Marianna," which she submitted to Dial's office in February 1972.[13]

To the best of my knowledge I have been trying to analyze this situation or these problems for a month because I don't live here.

Tyler's "Solution" suggested, *inter alia,* that blacks had been treated unfairly and that a number of remedial steps be taken. She received no direct response to or acknowledgment of her submission.

In the latter part of March 1972 Gatling filled out a second evaluation form on Tyler, on which she was rated significantly lower than on the first. Tyler was rated good on six criteria, fair on eight, poor on

When the children walked out, is when I really got concerned. I thought the entire faculty, (county-wide) should have become involved immediately. I had been sort of undecided as to what side was right or wrong black or white. I often ask myself what in the world is wrong with these people? So about the end of the second week of the boycott of the school, a close friend and brother-in-law of mine, Douglas Fears was suspended. Knowing him, like I do, I was almost for sure a report like I heard was wrong. I know he is not the person to give one person, a girl thirty licks but still I could not be sure. So after I found out about the school board meeting I immediately made my mind up to attend. Then the things that I sat and listened to actually made my heart hurt for days. It is hard for me to conceive the fact that a person would humiliate a person for spanking a child. Then as I sat there it seemed like the administrators took the students words over the teacher. This student was spanked; we have been beaten with whips clubs, sprayed on etc. and still the administrator will say nothing happened to us. When the superintendent said that washing a child's mouth out with soap is not corporal punishment, I thought to myself we are just equal to dogs in the (big) white man's eye sight or the man that is in supreme authority. I think we could start with a biblical solution. Do unto other's as ye will have them do unto you. In other words just treat us right. This is the way I treat my students. I treat them all right black or white. I try to set this example. I do this so when they got in authority they will do the same thing. How can we hate and do wrong before them and then expect them to do differently.

Now as far as the boycott on the town, I do not know anymore than I read in the paper. I can imagine it has created a bad living condition. I would suggest that one of the best things could happen at this time would be to move Douglas Fears to his classroom, it has really hurt a lot of teachers. He is no outlaw. He is human, intelligent and a diligent worker. I can imagine that little girl is humiliated and is wondering why her teacher is moved into a transportation department.

I think that the demands that students are really asking are:
1. Give us back our noon hour for lunch.
2. Give us back our Homecoming and parade.
3. Let us have a social every once in a while at school.
4. Let us have a talent show.

How would you feel if someone had taken what you cherished or your enjoyment in life? The children do not have time to exercise their energy, if they do all they know in detention hall and rebound school. Why did the administrator deprive the students of these activities. Is it because they think the black boy and the white girl will associate? Why not let them have their freedom the white man and the black woman have always had theirs. A school with no social activity can only create more delinquency, more rebellion, and promote homo-sexuality. If we want our students to want to come to school and study we got to have that atmosphere. We can not turn a school into a prison and expect them to be satisfied.

*Solutions*
1. Treat the black man right.
2. Drop charges against the 200 students at Lee if this is what it takes to save the other 2,800.
3. Move Douglas Fears back in his classroom. (This will help the faculty relationship. He's no animal.)
4. Arrange an assembly with all the teachers and come up with some solutions, as to how you're going to start us right or equal.
5. Arrange an assembly with the parents through their leaders and tell them your plans.
6. Stop trying to deal with the black man as though it is 1872 instead of 1972. The black man is as smart as the white man, he's just not as independent so we can not meet separately any longer because all the time the black man is figuring out these tricks. If we're for right and brotherhood of man, democracy, why can't we meet together? Why is there just one black man on the school board, when the population is 80% black? Why can't we just make it look fair?
7. Get rid of this attitude "We whip yours but don't you whip ours".
8. If we're for the same purpose of idea, "Brotherhood of man". Why don't we get rid of these separate councils and unite into one. Separate councils can only create more hate.
9. Give the students more social activities. This is also a part of their life.

two, and unsatisfactory on four. Gatling wrote the following comments on the form:

says that "some students don't try and I just leave them alone"

she spends too much time behind her desk

is habitually late to work

is out of her classroom frequently

admits that English to her is a "dull subject"

she appears tired most of the time

it is not good judgment to leave your classroom unattended—nor to make the above mentioned remarks about your profession

seems to be a "clock watcher"

I have spoken to her about "something" affecting her teaching

She is frequently late to work

Gatling recommended that Tyler's contract not be renewed.

Tyler testified that Gatling did not visit her classroom for purposes of observing her teaching performance during the period from November 1971 to January 15, 1972, and that he made only one such visit between January 15 and April 13, 1972. At the time of that visit, Tyler was reviewing an examination with the four students who were present that day. Tyler further testified that Gatling made no comments to her on the day of his visit; that he did not, thereafter, discuss his evaluation with her; and that she did not receive a copy of the evaluation until after her dismissal. Finally, Tyler stated that her teaching methods remained constant during the first and second semesters of 1971–72, the only difference being the number of students on which she had to utilize them. Before the boycott, Tyler taught approximately 200 students. Afterwards, she taught only one class, attended by approximately four students.

On April 18, 1972, Tyler was notified that the school board had voted to not renew her contract. The letter stated:

The reason given was that you had received a low rating in teacher effectiveness in comparison with other teachers in the district. Also, the performance evaluation sheet reports that you are frequently late to work.

Tyler was given a hearing before the board, following which the decision to not rehire her was reaffirmed.

At trial, the defendants offered little additional evidence concerning the basis for Tyler's dismissal beyond the ratings and comments reflected in Gatling's March evaluation. Some notes by Gatling were introduced, indicating that he had observed her leaving her classroom unattended on four occasions in early March. Gatling also testified that Tyler was late to school on 46 occasions between September and April. He conceded, however, that on only one occasion did she arrive after the time that students were to be in class, and on that particular day she was involved in an auto accident. Teachers were instructed to report at 8 a.m. Students were to be in class at 8:10 a.m.

Tyler denied that she was habitually late, and introduced into evidence sign-in sheets showing that she generally reported to school within a few minutes of eight o'clock during the period from April 24 to May 26, 1972. The defendants offered no documentary evidence in this regard. Tyler also denied the allegations that she was tired and was a clock watcher, and stated that she left her classroom only when necessary—to take one or two children to another classroom, etc. She further stated that her statements with respect to teaching enthusiasm were misrepresented. She recalled her statement as to English being dull as occurring during a conversation concerning students' motivation in general, and as being that English may be dull compared to other subjects.

Tyler testified that she believed her dismissal stemmed from her race and the content of her proposed solution. As the basis for her conclusion that the "Solution" was a factor, Tyler offered the following account of testimony given by Gatling at her school board hearing.

A. He kept going over things like mentioning "English is a dull subject" and

"Tired most of the time" and "Seems to be a clock watcher", and Attorney Daggett said, "Can't you get down to anything more specific?" And he said, "Solution to the Problem that she wrote", and that was in the Marianna hearing.

■ The district court found that Tyler's dismissal was in no way motivated by her race or her boycott activities. Our review of the record, however, convinces us that this finding is clearly erroneous. Based on Gatling's reference to Tyler's "Solution" at her school board hearing, and the apparent lack of foundation for the marked decline in her second evaluation, we think it clear that Tyler's expression of her views as to the boycott was a factor in her termination. We are further unpersuaded that the articulated reasons for Tyler's nonrenewal would have resulted in her dismissal absent the impermissible considerations. We hold that the nonrenewal of Tyler's contract violated her civil rights.

*Robindale Robinson*

Prior to unification, Robindale Robinson taught in Marianna's black school system. She had been a teacher for over 30 years. In 1970–71, she was transferred to the Moro school. She taught fifth grade there during that year as well as the following year. Her principal was Wayne Thompson, who is white.

In April 1971 Robinson received a rather low evaluation from Thompson. She was rated fair on seven criteria, needs to improve on 13, and unsatisfactory on seven.[14] The form also contained the following comments by Thompson:

> Is a very ineffective teacher, can not control children, lacks energy and vitality required to maintain a teacher's position. Recommend for reemployment only on the basis that this teacher will be hired and placed on probation with an understanding that improvement must be made next year.

The following year, Thompson again evaluated Robinson, in December 1971. She was rated fair on nine criteria, poor on seven, and unsatisfactory on five.[15] The record also reveals that during the period from September 30 to December 15, 1971, Thompson held four conferences with Robinson to discuss such matters as Robinson's classroom management, her attention to individual needs, and her tardiness.

Robinson testified that after the events of January 13, 1972, Thompson "Harassed me a little on—kinda under the cover." She stated:

> Well, he came down to my room several times after January 13th to talk with me about the boycott, and, really, when I decided—in fact, he didn't tell me exactly that he wasn't going to rehire me, but I could tell from his actions that he wasn't going to rehire me, because he came down one morning and asked me to come out in the hall and let him talk with me, and when I went out, he said, "Mrs. Robinson, I have several calls on you that you are a trouble maker", so I said, "Well, I won't ask you who they were, whether they were white or black, because whoever they were, I don't care, they didn't tell you the right thing, because I am not a trouble maker". He said, "Well, it was said that I could tell you were a trouble maker from the way you wear your hair".

It appears that Robinson supported the boycott, and that she refused an administration request to sign a letter asking the boycotting students to return to school.

On March 15, 1972, Thompson again evaluated Robinson. This time, she was rated fair on six criteria, poor on six, and unsatisfactory on eight. Attached to the form were the following notes:

> DO NOT RECOMMEND FOR REEMPLOYMENT:
>
> In making last year's evaluation report I stated:

---

**14.** The District employed a different evaluation form in 1970–71 than that used in 1971–72.

**15.** The form contained only 20 criteria; however, check marks appeared under both the fair and poor columns with respect to "Response to supervision and suggestions for improvement."

(Mrs. Robinson is a very ineffective teacher, can not control children, lacks energy and vitality required to maintain a teacher's position. Recommend for reemployment only on the basis that this teacher will be hired and placed on probation with an understanding that improvement must be made next year.) I can see that no improvement has been made this year from last. Mrs. Robinson still lacks all the needed qualities of a good teacher stated above as she did last year.

This decision was made after numerous classroom visits and principal-teacher conferences. It was after this that I realized that Mrs. Robinson was not going to make any improvements as a teacher.

Also, this year Mrs. Robinson has developed an attitude against education. This in itself would be enough for me not to recommend her for reemployment, although this has nothing to do with my decision not to recommend her for reemployment. My decision was made on December 15, 1971. I was not sure of Mrs. Robinson's anti-educational feelings until January 13, 1972. Mrs. Robinson's participation in the school boycott has nothing to do with my decision.

My decision has been based solely on the needs of the children of my school. Continuing Mrs. Robinson as a teacher would result in little or no educational gains for the children Mrs. Robinson would teach. It is my firm belief that teachers are employed at Moro Elementary School for the enrichment of the children that attend this school. It is with this in mind that I do not recommend Mrs. Robinson for employment at Moro Elementary for the 1972–73 school year.

The most striking disparity between Robinson's two 1971-72 evaluations was a decline in the March evaluation from fair to unsatisfactory on two criteria: "Observance of ethics of the teaching profession," and "Response to authorized policies & procedures." At trial, Thompson testified that Robinson's unsatisfactory rating on the ethics criterion was due in part to her refusal to show a willingness to get the boycotting students to return to school.

On April 18, Robinson was notified that the board had voted to not renew her contract for the reason that she "had received a low rating in teacher effectiveness in comparison with other teachers in the district." Robinson requested and received a hearing before the school board, following which the nonrenewal decision was sustained.

 The district court found that Robinson's dismissal was solely for the purpose of upgrading Marianna's educational system, and that it was not racially motivated. Based on the evidence outlined above, the question is not without difficulty; however, we conclude that the district court's finding that Robinson's termination was not motivated by impermissible reasons is not clearly erroneous. We find, further, that even assuming that improper considerations entered into the decision to dismiss Robinson, the record evinces persuasive evidence that her ineffectiveness as a teacher would have resulted in her dismissal even in the absence of the improper considerations. Accordingly, we uphold the district court's conclusion that Robinson was not denied her constitutional rights.

### Douglas Fears

Douglas Fears was first employed by Marianna in 1969–70. In 1971–72 he taught at Strong Junior High School.

Sometime during late January 1972 approximately two weeks after the inception of the boycott, Fears took three girls who were misbehaving in class to the principal's office and paddled them. Two of the girls were white, and one was black. Fears' principal, Larthell Young, was not in the office at the time. The District had an established policy, known to Fears, which provided that corporal punishment be administered only in the principal's office and in the presence of the principal.

The following day, the parents of one of the white girls visited Dr. Dial's office, complaining that their child had been paddled excessively. Dial testified that he examined the girl's buttocks and found them to be bruised excessively. Similar testimony was given by Bob McGinnis, then secretary and later president of the school board, as well as a doctor who examined the child. Dial further stated that when asked for an explanation, Fears said that he "was very sorry but he'd lost control of himself." Fears denied saying that he had lost control of himself, and stated further that all three of the girls were punished in a similar manner: the black girl received 11 licks, the other two received 10.

Fears was immediately suspended from his teaching position. A short time later, following a hearing, the school board decided to allow Fears to finish out his contract, and restored his pay. Fears, however, was not returned to his teaching duties, but was assigned to the transportation department.

Towards the end of the semester, a dispute arose between Fears and Dr. Dial concerning absenteeism. Dial testified that on several occasions, Fears could not be located anywhere on campus. Fears admitted that he was often away from his assigned duty station, stating that he was given only minimal duties which occupied approximately 45 minutes daily, and that his office was in a warehouse which was unsanitary and became bug infested when the heat was turned on. He stated, however, that he was present on other parts of the campus. Fears was asked to sign certain forms required by the District relating to the days missed and the reasons therefor, but refused. According to Fears, he refused to sign because the first time he had used his sick leave his check had been cut, and because he had not been absent from the campus. In contrast Dial testified that when asked to sign, Fears said: "You already know how many days I missed, why do you want me to sign it?" In any event, Fears' refusal to sign the form precipitated his being summarily dismissed for insubordination two or three weeks before the end of the school year. Fears stated that he was not paid for that part of the school year remaining after his dismissal.

At trial, Lon Mann conceded that pressure or expected pressure from the white community influenced the decision to remove Fears from the classroom. He further testified, however, that if the paddled child had been black, Fears probably would have been treated the same way. To the question of what action would have been taken against a white teacher paddling a white child, Mann stated: "I don't know, if we had had as much pressure on it, we would have gotten rid of anybody." It was also brought out at trial that the previous year, a white principal had been transferred to the transportation department for meting out excessive corporal punishment, and had not been reemployed the following year.

 The district court found that Fears' dismissal was not racially motivated. Our review of the record discloses only scant evidence that racial considerations motivated Fears' transfer to the transportation department, and no evidence that such considerations prompted his dismissal. Accordingly, we hold that the district court's finding is not clearly erroneous.

*Bob Cain*

Bob Cain was first employed by Marianna in 1966. In 1971–72, he was a music teacher at Lee High School. His principal was Bob Blankenship.

In December 1971 Cain received a relatively low evaluation from Blankenship. He was rated good on three criteria, fair on ten, and poor on seven. Cain admitted that after the first evaluation, Blankenship told him that his work would have to improve for him to continue at Marianna.

Cain testified that he did not feel very strongly one way or the other about the boycott, and that he did not discuss his views on it with anyone. The only evidence of boycott related displeasure with Cain on the part of the administration was testimony by Blankenship that Cain left his teach-

ing station at the outbreak of the January 13 demonstration, contrary to instructions given to all teachers over the intercom. Blankenship further testified, however, that Cain returned to his teaching station when directed to do so.

In March 1972 Cain received another low evaluation from Blankenship. Cain was rated good on two criteria, fair on seven, and poor on 11. In a memorandum attached to the evaluation form, Blankenship noted several deficiencies in Cain's teaching performance and recommended that his contract not be renewed.

On April 18, 1972, Cain was notified that the school board had voted to not renew his contract based on "a low rating in teacher effectiveness in comparison with other teachers in the district." Following a hearing before the school board, the decision to terminate Cain was reaffirmed.

█ The district court found that Cain's discharge was not racially motivated or in violation of any of his constitutional rights. We hold that this finding is not clearly erroneous.

*Rebecca Fears*

Rebecca Fears was hired by Marianna a few days before the opening of the 1971–72 school year as a replacement teacher. She taught seventh grade math at Strong Junior High School. Her principal was Larthell Young, who is black and a member of the plaintiff class in this case.

The year prior to her employment by Marianna, Fears taught in another school district, but was dismissed four months prior to the end of the school year after suffering a nervous breakdown. As a result of her illness, Fears spent a period of time in a mental institution. She testified that she did not volunteer any information about her illness at the time she applied to Marianna, and that she was not asked about it. Fears further testified that she was taking medication during her employment at Marianna, but that her doctor told her that she was physically able to work.

During the first semester of the 1971–72 school year, Fears received a performance evaluation from Young which was neither extremely high nor extremely low. She was rated good on ten criteria and fair on ten.

The record discloses no evidence as to Fears' views on the boycott, or any involvement by her in the events surrounding it. Nor does it appear that the school administration viewed her as a supporter of the boycott.

In the spring of 1972 Fears was again evaluated by Young. She was rated good on nine criteria, fair on eight, and poor on three. In a memorandum attached to the evaluation form, Young set forth the following conclusions:

1. Classroom control is very poor. Classroom control is not conducive to a good learning situation.

2. Inconsistency in grading students [sic] work indicates a seeming lack of understanding of subject matter or lack of mental alertness.

3. Absence from school without notification of proper school authorities indicate [sic] a lack of respect for school policies.

4. I have observed Mrs. Fears asleep in the teachers lounge during her planning period. She has also appeared to be asleep at her desk at times. Generally she appears to be below average in energy. I have discussed her lack of energy with her. She stated that this is caused by medication that is taken by her.

He recommended that she not be rehired. Thereafter, the board voted to not renew Fears' contract. The reason given was "a low rating in teacher effectiveness in comparison with other teachers in the district." At trial, Dr. Dial testified that Fears had the lowest rating in her school.

The district court found that Fears' dismissal was not racially or otherwise impermissibly motivated. We hold that this finding is not clearly erroneous.

*Gladine Gregory*

From 1967–68 through 1971–72 Gladine Gregory taught in a small rural schoolhouse at Haynes, Arkansas. While at Haynes, Gregory had no principal. She was directly supervised by the Marianna central administration.

Dr. Dial testified that he visited the Haynes school approximately 15 times during 1971–72, and observed Gregory's teaching performance on each occasion. He stated that Gregory had a "very difficult time in managing the classroom situation." Dial further stated that he thought much of the basis for Gregory's inefficiency was poor eyesight, but also noted a lack of ability. It does not appear that a formal evaluation report was prepared on Gregory. Dial testified, however, that she would have rated very low.

As a result of unification, the Haynes school was closed at the end of 1971–72. Dial stated that he had a conference with Gregory at that time in which he told her that he would not recommend her to the school board as a classroom teacher, feeling that she needed additional in-service training. He offered instead to employ her as a teacher's aide, with the possibility that she might later be rehired as a teacher. Thereafter, Gregory received notice that the board had voted to not renew her teaching contract because of a low rating in comparison with other teachers in the District.

Gregory accepted Dial's offer and worked as a teacher's aide during 1972–73. She was not thereafter rehired as a teacher by the District.[16] Emma Davis, the principal under whom Gregory worked in 1972–73, testified that she did not prove to be a good aide. It appears that Gregory left the District after 1972–73; however, the circumstances thereof are not detailed in the record.

Gregory testified that she did not think that her termination at the end of 1971–72 was connected with the boycott. She had no strong views on it, and had two children who attended school during the boycott, except when they were ill. She did testify, however, that she viewed her race as having something to do with her dismissal, based on the fact that she had a white aide in 1971–72 with whom she had several differences.

■ The district court found that the nonrenewal of Gregory's contract was not motivated by any constitutionally impermissible considerations. We hold that this finding is not clearly erroneous.

### V.

In summary, we reverse the judgment of the district court with respect to its findings that A. L. Johnson, Irma Clark and Lula Tyler were not deprived of their constitutional rights, and its denial of relief to those plaintiffs. Except for its resolution of the statute of limitations question, the district court judgment is in all other respects affirmed.

We remand the cause to the district court for a determination as to the appropriate relief. As to A. L. Johnson, we have already indicated the nature of relief to which he is entitled. (See footnote 5, *supra*.) Regarding Clark and Tyler, the district court shall determine whether they are currently desirous of reinstatement. If so, it shall direct the defendants to offer them the first vacancies for which they are qualified. Clark and Tyler are also entitled to an award of back pay. The period for which damages may be shown is the period between plaintiffs' terminations and the filing date of this opinion. If either of them desires reemployment, she shall be entitled to additional back pay for the period between the date of this opinion and the effective date of reemployment. The normal rules respecting mitigation of damages shall apply. *See Moore v. Board of Ed. of Chidester School Dist. No. 59, supra,* 448 F.2d at 714–15; *Smith v. Board of Ed. of Morrilton School Dist. No. 32, supra,* 365 F.2d at 784.

---

16. At the time of trial Gregory was employed as a teacher for Christ's Church Nursery and Kindergarten in Forrest City.

The trial court shall also award attorneys' fees to plaintiffs' counsel in an amount adequate to compensate counsel for services rendered in the district court. Attorneys' fees in the sum of $2,000 are awarded to plaintiffs' counsel for services rendered in this appeal.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with the views expressed in this opinion.