Herbert WILLIAMS, Virginia S. Williams, Robert Manson, Mary Manson and Donald Massey, Plaintiffs-Appellants/Cross-Appellees,

v.

Robert ANDERSON, Ella Mae Carroll, William Doug Grizzle, Lew Sorrels, Carl Geisler, Directors of the Brinkley School District, and Dewey Snowden, Superintendent of the Brinkley School District, Defendants-Appellees/Cross-Appellants.

Nos. 76–1172 and 76–1108.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1976.

Decided Aug. 31, 1977.

John W. Walker, Walker, Kaplan & Mays, P. A., Little Rock, Ark., for Williams, et al.; Jack Greenberg, James C. Gray, Jr., New York City, Philip E. Kaplan and Henry L. Jones, Jr., Little Rock, Ark., on brief.

G. Ross Smith, Little Rock, Ark., for Anderson, et al.; Smith, Williams, Eldredge & Clark, Little Rock, Ark., on appendix.

Before HEANEY and ROSS, Circuit Judges, and VAN PELT, Senior District Judge.[*]

HEANEY, Circuit Judge.

This appeal requires us to decide several complex and difficult questions that arose when the Brinkley School District, which had maintained separate Black and White schools, began integrating the school system. In April, 1973, the plaintiffs,[1] Black faculty members and a Black applicant for a position as a faculty member, dissatisfied with the treatment of Blacks, brought an action pursuant to 42 U.S.C. § 1983 in the District Court for the Eastern District of Arkansas. They sought individual and class relief contending that the defendants, the superintendent and individual members of the Board of Education, had discriminated against them with respect to assignment, salary, promotion and hiring.

The trial court certified a class consisting of Black applicants for faculty positions and Black faculty members employed by the School District, prior to and at the time of unitization. It determined that the plaintiffs had the burden of proving that the defendants had discriminated against Black faculty members and Black applicants.[2] Finding that the defendants had discriminated against Black faculty members by paying them $100.00 per year less than White faculty members through the 1967–1968 school year, the trial court awarded each Black faculty member employed for the 1967–1968 school year the sum of $100.00.[3] It also found that the School District followed a policy during the 1971–1972, 1972–1973 and 1973–1974 school years of filling White faculty vacancies with Whites and Black faculty vacancies with Blacks, and ordered the discontinuation of this policy.[4] The defendants were found to have discriminated against Black faculty members by failing to use objective standards in assigning, promoting and hiring and were ordered to adopt objective standards for those purposes in accordance with the requirements set forth in *Moore v. Board of Ed. of Chidester Sch. Dist. No. 59, Ark.*, 448 F.2d 709 (8th Cir. 1971). The Court stated that the standards set by the State Department of Education and the

[*] ROBERT VAN PELT, Senior District Judge, District of Nebraska, sitting by designation.

[1] The plaintiffs, Herbert Williams, Virginia S. Williams, Robert Manson and Donald Massey, Black teachers, have been employed by the Brinkley School District for several years. The plaintiff, Mary Manson, also Black, applied several times without success for a teaching position with the Brinkley School System. No appeal has been taken from class certification.

[2] The trial court cited *Arkansas Ed. Ass'n v. Board of Ed., Portland, Ark. Sch. Dist.*, 446 F.2d 763 (8th Cir. 1971). In *Portland*, the burden of establishing that salary differentials were discriminatory was satisfied by a statistical comparison of salaries. This Court rejected as clearly erroneous the trial court's finding that the salary differentials were not racially discriminatory. No mention was made in *Portland* or in the trial court's Memorandum Opinion in this case of the concept of a prima facie case.

[3] The trial court held that Ark.Stat. § 37–209, which establishes a five-year limitation period for actions on written contracts, applied.

[4] At the close of the trial, Judge Harris stated:
There has been a great deal of information, undisputed, here that the District developed a policy when integration was first started that if a vacancy would occur where a black person was employed, that vacancy would be filled by a black person; likewise, where the vacancy occurred wherein there was a white person, it would be filled by a white person. This is impermissible.

\* \* \* \* \* \*

[I]f the School District is going to pursue any kind of standards or policies about a ratio of blacks to whites in the School District, it's going to have to develop a standard within the criteria that I have indicated here that would make it more acceptable and at least bring the ratio more nearly in balance than the matter of some 75 to 22.

North Central Association should be considered in developing the objective standards. It also ordered the School District to adopt a uniform salary schedule for administrative and specialty personnel.[5] Subsequently, the trial court approved the criteria and the salary schedule submitted by the School District and awarded attorneys' fees to plaintiffs' counsel. Further relief to the named plaintiffs and other members of the class was denied on the ground that they had not been adversely affected by racial consideration in employment decisions.

On appeal, the plaintiffs claim that the trial court erred in failing to hold the plaintiffs had established a prima facie case of racial discrimination with respect to assignment, salary, promotion and hiring; in finding that neither the named plaintiffs nor any member of the class they represent had been adversely affected by racial considerations in their employment; in denying them further injunctive and monetary relief; and in requiring that discrimination be shown to be the sole basis for the refusal to hire Mary Manson, a Black applicant, for a teaching position. The plaintiffs also contend that the trial court erred in approving the criteria submitted by the defendants in response to the court's order that objective nonracial standards be developed.

The defendants contend that Ark.Stat. § 37–206, a three-year statute of limitations, applies and that for this reason, the trial court erred in awarding monetary relief for the salary differentials found to exist during the 1967–1968 school year. They also contend that attorneys' fees should not have been awarded, and that School Board members and school officials are immune from damage awards under *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

I

■■■ Unlike the trial court, we may examine the issues relating to requisite intent in light of recent decisions of the United States Supreme Court. *Hazelwood School District v. United States,* —— U.S. ——, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Arlington Heights v. Metro. Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). These and other decisions establish that the plaintiffs must prove an intent to discriminate on the part of the defendants to prevail in a § 1983 action. The opinions recognize that admission of discriminatory intent is unlikely, and that intent will ordinarily have to be found by "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Arlington Heights v. Metro. Housing Corp., supra,* 429 U.S. at 465, 97 S.Ct. at 564, including the impact of the challenged official action,[6] its historical background[7] and its legislative or adminis-

---

5. Included in this category are home economics, band and choral music teachers, as well as guidance counselors and coaches.

6. As Justice Stevens points out in his concurring opinion in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), "the line between discriminatory purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of the Court's opinion might assume." *Id.* at 254, 96 S.Ct. at 2054. He notes that:

> Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation. It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or, conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process. *Id.* at 253, 96 S.Ct. at 2054.

7. Proof that the defendants engaged in racially discriminatory practices and policies prior to the period of time for which relief is available under the statute of limitations is relevant since it creates the inference that the discrimination continued, particularly when there has been little change in the decisionmaking process.

trative history. *Id.* at 465–466, 97 S.Ct. 555. The Supreme Court has made it clear that "official action will not be held unconstitutional [in a § 1983 action] solely because it results in a racially disproportionate impact. 'Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination.'" *Arlington Heights v. Metro. Housing Corp., supra* at 464, 97 S.Ct. 555, 563, quoting *Washington v. Davis, supra* 426 U.S. at 242, 96 S.Ct. 2040. *See generally* Perry, *The Disproportionate Impact Theory of Racial Discrimination,* 125 U.Pa.L.Rev. 540 (1977). The decisions recognized that in some instances, discriminatory impact may be so great that a discriminatory purpose can be inferred. *See Hazelwood School District v. United States, supra,* —— U.S. at ——, 97 S.Ct. 2736; *International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 324, 97 S.Ct. 1843; *Castaneda v. Partida,* 430 U.S. 482, 489–491, 97 S.Ct. 1272, 1277–1278, 51 L.Ed.2d 498 (1977). They further recognize that evidence of discriminatory intent may be sufficient to establish a prima facie case of racial discrimination and to create a rebuttable presumption in favor of individual relief.

The use of rebuttable presumptions is not new in civil rights cases where intentional discrimination must be shown. *See Keyes v. School District No. 1,* 413 U.S. 189, 209– 210, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). In *Arlington Heights v. Metro. Housing Corp., supra,* the Supreme Court recognized the validity of rebuttable presumptions in actions under § 1983. While the Court held the plaintiffs had not established a prima facie case of purposeful discrimination by the Village of Arlington Heights, it indicated that when the requisite threshold showing is made, the burden will shift to the defendants to establish "that the same decision would have resulted even had the impermissible purpose not been considered." *Id.* 429 U.S. at 468, n. 21, 97 S.Ct. at 566.

This Circuit has often applied the concept of a prima facie case in teacher discrimination cases brought under § 1983. *Lyons v. Board of Ed. of Charleston, Etc.,* 523 F.2d 340 (8th Cir. 1975) (prima facie case not established); *United States v. Cotton Plant School Dist. No. 1,* 479 F.2d 671 (8th Cir. 1973); *Moore v. Board of Ed. of Chidester Sch. Dist. No. 59, Ark., supra; Haney v. County Board of Education of Sevier County,* 429 F.2d 364 (8th Cir. 1970).

■ The concept that establishment of a prima facie case of racial discrimination creates a rebuttable presumption in favor of individual relief is developed in civil rights cases brought under Title VII of the Civil Rights Act, 42 U.S.C. § 2000–e *et seq.*[8]

---

*Cf.* Fed.R.Evid. 406; *Hazelwood School District v. United States,* —— U.S. ——, —— n. 15, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Arlington Heights v. Metro. Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, 466 (1977); 1, 2 Wigmore, *Evidence* §§ 92, 302–305, 371, 375 (3d ed. 1940).

**8.** The relationship between Title VII cases where disparate treatment is alleged and § 1983 cases where intent must be proven is clearly spelled out in *International Brotherhood of Teamsters v. United States, supra,* where the Court stated:

"Disparate treatment" such as alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. See, *e. g., Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265–266 [97 S.Ct. 555, 50 L.Ed.2d 450] * * *

Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. See *infra,* at 22. Proof of discriminatory motive, we have held, is not required under a disparate impact theory. Compare, *e. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 430–432, [91 S.Ct. 849, 28 L.Ed.2d 158] with *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–806, [93 S.Ct. 1817, 36 L.Ed.2d 668.] See generally Schlei & Grossman, Employment Discrimination Law 1–12 (1976); Blumrosen, Strangers in Paradise: *Griggs v. Duke*

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, *supra* at 351, 97 S.Ct. 1843; *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 772–773, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). *See generally Hazelwood School District v. United States, supra; McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *United States v. N. L. Industries, Inc.,* 479 F.2d 354 (8th Cir. 1973). In *International Brotherhood of Teamsters v. United States, supra,* Mr. Justice Stewart stated:

> [t]he holding in *Franks* that proof of a discriminatory pattern and practice creates a rebuttable presumption in favor of individual relief is consistent with the manner in which presumptions are created generally. Presumptions shifting the burden of proof are often created to reflect judicial evaluations of probabilities and to conform with a party's superior access to the proof. See C. McCormick, Handbook of the Law of Evidence §§ 337, 343 (E. Cleary ed. 1972); James, Burdens of Proof, 47 Va.L.Rev. 51, 61 (1961). See also *Keyes v. School Dist. No. 1,* 413 U.S. 189, 208–209[, 93 S.Ct. 2686] [.] These factors were present in *Franks.* Although the prima facie case did not conclusively demonstrate that all of the employer's decisions were part of the proven discriminatory pattern and practice, it did create a greater likelihood that any single decision was a component of the overall pattern. Moreover, the finding of a pattern or practice changed the position of the employer to that of a proven wrongdoer. Finally, the employer was in the best position to show why any individual employee was denied an employment opportunity.

*Id.* at 359, n. 45, 97 S.Ct. at 1866.

*Power Co.* and the Concept of Employment Discrimination, 71 Mich.L.Rev. 59 (1972). Either theory may, of course, be applied to a particular set of facts.
*Id.* at 335, 97 S.Ct. at 1854,
We particularly note the Court's citation to *Village of Arlington Heights,* a case brought under 42 U.S.C. § 1983. In this case, we are dealing with claims of disparate treatment.

We turn now to the question of whether, on the basis of this record, a prima facie case of purposeful discrimination against Black faculty and applicants was established. There is no "inflexible formulation" of what constitutes a prima facie case to guide us in this determination; it varies with respect to differing factual situations. *See International Brotherhood of Teamsters v. United States, supra* at 358, 97 S.Ct. 1843; *McDonnell Douglas v. Green, supra* 411 U.S. at 802, n. 13, 93 S.Ct. 1817. *See generally* Schlei and Grossman, *Employment Discrimination Law* 1147–1196 (1977); Note, *Beyond the Prima Facie Case in Employment Discrimination Law: Statistical Proof and Rebuttal,* 89 Harv.L.Rev. 387 (1975).

Brinkley School District No. 1 is located in Monroe County in Western Arkansas.[9] In 1970, the City of Brinkley had a population of 5,275, of which 40.5 percent was Black.[10] Monroe County had a population of 15,657 in 1970, of which 43.7 percent was Black.[11] Only Whites have been members of the Brinkley Board of Education. The School District maintained a dual school system, with separate schools for Blacks and Whites, until the 1966–1967 school year. During the maintenance of that system, the all-White Brinkley High School met the standards of and was a member of the North Central Association. The all-Black Marion Anderson School was not a member of the NCA nor did it meet its standards. The School District subsidized the football and band programs at the White school. Black students had to raise money themselves to initiate a football program and to buy band uniforms.

A freedom-of-choice plan was implemented during the 1966–1967 school year. Little, if any, integration occurred under the

9. Brinkley is one of the three school districts located in Monroe County.

10. Characteristics of the Population, Vol. 1, part 5—Arkansas, U.S. Dept. of Commerce, Bureau of the Census (1973).

11. *Ibid.*

plan. Marion Anderson School, which accommodated students from grades 1 through 12, remained entirely Black. Some Black students exercised their freedom of choice and attended the formerly all-White Brinkley Elementary, Junior High and Senior High Schools. While there are no records available as to the number of Black students exercising this choice, there was testimony that these schools remained predominantly White.

Until the 1968–1969 school year, the School District maintained separate salary schedules for Black and White classroom teachers, with Blacks receiving at least $100.00 less a year. In that year, a single salary schedule was adopted for all classroom teachers. Administrative and specialty personnel salaries were not included in the schedule. Salaries for these positions were determined on an individual basis by the Board of Education. No objective standards existed on which the Board could base its decisions.

In the 1967–1968 school year, seven of the eight Blacks holding specialty or administrative positions received lower salaries than Whites in similar positions, and one received the same salary. In the 1968–1969 school year, six of the seven Blacks holding specialty positions received lower salaries than Whites in similar positions, and one received the same salary. In the 1969–1970 school year, the year immediately preceding unitization, every Black in a specialty or administrative position received a salary less than that received by Whites in similar positions.[12] Blacks were not permitted to participate in the summer work program until the Summer of 1970.

The School District was unitized in the 1970–1971 school year pursuant to a directive of the Department of Health, Education and Welfare. No Blacks were involved in the formulation of a plan for unitizing the School District. In the first year of unitization, classes were constituted largely on a racial basis.

No Black or White faculty members were asked to resign at the time of unitization. Blacks were hired to fill only two of the thirty-one vacancies that occurred when plans for unitization were announced. Since eleven Blacks had either retired or resigned, there was a dramatic decrease in the number of Black faculty members in both absolute and percentage terms.[13] No attempt was made to recruit Black teachers, either from neighboring school districts or from colleges within the state. The ratio of Black-to-White faculty members established at unitization was maintained at least through the 1972–1973 school year by the School District's practice of hiring Black applicants to replace Black faculty members and White applicants to replace White faculty members.[14] There was no system for notifying the faculty of vacancies occurring within the school system.[15]

---

12. *See* Appendix A (Salary Schedule).

13. *RACIAL COMPOSITION OF THE BRINKLEY SCHOOL DISTRICT FACULTY MEMBERS FROM THE 1967–1968 TO THE 1972–1973 SCHOOL YEAR*

| School Year | Blacks | % | Whites | % | Total | |
|---|---|---|---|---|---|---|
| 67–68 | 37 | (41) | 54 | (59) | 91 | |
| 68–69 | 38 | (42) | 53 | (58) | 91 | |
| 69–70 | 31 | (34) | 61 | (66) | 92 | |
| 70–71 | 22 | (22) | 80 | (78) | 102 | Year of unitization. |
| 71–72 | 25 | (25) | 75 | (75) | 100 | |
| 72–73 | 24 | (22) | 84 | (78) | 108 | |

14. Applicant data would be relevant but not conclusive since the School District had a known policy of racial discrimination. Black applicants might have failed to apply simply because application would be fruitless. *See Dothard v. Rawlinson*, —— U.S. ——, ——, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *International Brotherhood of Teamsters v. United States, supra*, 431 at 362–369, 97 S.Ct. 1843.

15. The method and extent of the defendants' minority recruiting efforts has been considered an important factor in establishing a prima facie case. *See Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970); Schlei and Grossman, *Employment Discrimination Law* 1194 at n. 217 (1976).

The head football coach testified that he only contacted Whites for available coaching positions. Neither of the two Black assistant coaches were considered for vacancies occurring prior to the filing of this action. Beginning with the 1968–1969 school year, the number of Blacks in specialty positions was gradually reduced from eight to four and the number of Whites in such positions gradually increased from eleven to fifteen.[16]

No Blacks were assigned to administrative or head coach positions in the year of unitization even though Black faculty members had previously held such positions at the all-Black Marion Anderson School. For the year of unitization and the next two school years, only one Black holding a specialty or administrative position received more than a White holding a similar position.[17] Until the 1972–1973 school year, no Black received extra pay for serving as an advisor to student groups or for performing other additional school duties.[18]

Since unitization,[19] only one Black faculty member has been promoted to fill an administrative position. The other six administrative vacancies have been filled by Whites from both within and without the School District. In the school years since unitization, no Blacks have been hired from outside the School District to fill specialty positions. Ten Whites have been so hired.[20]

16. *RACIAL COMPOSITION OF THE BRINKLEY SCHOOL DISTRICT SPECIALTY AND ADMINISTRATIVE PERSONNEL FROM THE 1967–1968 TO THE 1972–1973 SCHOOL YEAR **

| School Year | Blacks | % | Whites | % | Total | |
|---|---|---|---|---|---|---|
| 67–68 | 8 | (42) | 11 | (58) | 19 | |
| 68–69 | 7 | (35) | 13 | (65) | 20 | |
| 69–70 | 5 | (28) | 13 | (72) | 18 | |
| 70–71 | 4 | (21) | 15 | (79) | 19 | Year of unitization. |
| 71–72 | 5 | (23) | 17 | (77) | 22 | |
| 72–73 | 5 | (25) | 15 | (75) | 20 | |

*These figures refer to the number of individuals holding specialty positions rather than the number of positions as individuals may coach more than one sport or coach and hold an administrative position.

17. *See* Appendix A.

18. While the record is unclear, it appears that Leon Randolph received additional pay for directing the Head Start Program in the 1972–1973 school year. He received $1,400 for doing so in the 1973–1974 school year.

19. *See* Appendix A.

20. *RACIAL COMPOSITION OF PERSONNEL HIRED TO FILL VACANCIES IN THE BRINKLEY SCHOOL DISTRICT*

| School Year | ADMINISTRATIVE | | |
|---|---|---|---|
| | Blacks | Whites | Total |
| 1967–1968 | | 3 | 3 |
| 1968–1969 | 1 | | 1 |
| 1969–1970 | 1 | 2 | 3 |
| 1970–1971 | | 3 | 3 |
| 1971–1972 | 1 | 1 | 2 |
| 1972–1973 | | 6 | 6 |

| School Year | SPECIALTY | | |
|---|---|---|---|
| | Blacks | Whites | Total |
| 1967–1968 | 1 | 2 | 3 |
| 1968–1969 | 2 | 4 | 6 |
| 1969–1970 | 1 | 2 | 3 |
| 1970–1971 | | 1 | 1 |
| 1971–1972 | | 5 | 5 |
| 1972–1973 | | 2 | 2 |

| | TEACHING | | |
|---|---|---|---|
| | Blacks | Whites | Total |
| 1967–1968 | 5 | 12 | 17 |
| 1968–1969 | 5 | 9 | 14 |
| 1969–1970 | 5 | 12 | 17 |
| 1970–1971 | 2 | 25 | 27 |
| 1971–1972 | 3 | 10 | 13 |
| 1972–1973 | 1 | 14 | 15 |

| | TOTAL | | |
|---|---|---|---|
| | Blacks | Whites | Total |
| 1967–1968 | 7 (30%) | 16 (70%) | 23 |
| 1968–1969 | 8 (38%) | 13 (62%) | 21 |
| 1969–1970 | 7 (30%) | 16 (70%) | 23 |
| 1970–1971 | 2 ( 6%) | 29 (94%) | 31 |
| 1971–1972 | 4 (25%) | 16 (75%) | 20 |
| 1972–1973 | 1 ( 4%) | 22 (96%) | 23 |

In 1970–1971, there were four uncertified White teachers in the school system. There was one Black uncertified teacher. In 1971–1972, there were two uncertified White teachers and one Black uncertified teacher. In 1972–1973, there were two uncertified White teachers in the school system and one Black uncertified teacher.

■ In summary, it is clear as a matter of law that purposeful discrimination existed in every aspect of school life until the dual school system was abolished and the unitized school system was established in the Fall of 1970. It is equally clear that purposeful discrimination against Black faculty and Black applicants continued after unitization and through the 1972–1973 school year. It follows that a prima facie case of purposeful racial discrimination was established with respect to assignment, salary, promotion and hiring of Black faculty members for up to and including the 1972–1973 school year.[21] Thus, a rebuttable presumption in favor of individual relief was established. The trial court erred in failing to so hold.

## II

We turn now to the question of whether the defendants have rebutted the presumption created with respect to each of the individual plaintiffs and otherwise identified members of the class. We are mindful of the Supreme Court's comments in *Hazelwood School District v. United States, supra,* on the relative fact finding roles of the district and circuit courts, and we recognize that where factual disputes exist, the question must be remanded to the trial court.

*Individual Claims of Black Faculty Members for the 1967–1968 School Year.*

■ Until the 1968–1969 school year, the School District maintained a dual salary schedule under which Black teachers were paid $100.00 less per year in base pay than White teachers. After concluding that this action was governed by Ark.Stat. § 37–209, which provides for a five-year limitation period in actions on written contracts, the trial court awarded $100.00 to those teachers currently employed by the School District who had been employed in the 1967–1968 school year.[22] For the reasons stated in *Clark v. Mann*, 562 F.2d 1104 (8th Cir. 1977) (published concurrently with this opinion), we hold that this case is governed by Ark.Stat. § 37–206, which provides for a three-year limitation period. Thus, the relief ordered by the trial court for the 1967–1968 school year is barred by the statute of limitations.

*Melvin Bracely*

■ Melvin Bracely was first employed by the Brinkley School District in 1964 as a teacher at the elementary level. He has a B.A. degree from Arkansas Baptist College which was validated by Howard University. He is a minister of the gospel of the Baptist faith and has two small churches. For thirteen years, he had served as the head teacher, or principal, at a school in Kensett, Arkansas. Bracely has not been given any administrative responsibilities since he has been at Brinkley. On the basis of this record, we cannot say that Bracely was entitled to an administrative position since he testified that he "didn't see any real reason to pursue trying to get into administration, because I knew * * * I would not want administration to conflict with my religious work."

*Virginia Williams*

Virginia Williams has been employed by the Brinkley School District as a business education teacher since the 1969–1970

---

21. We cannot say that a prima facie case was established for the 1973–1974 school year. The action was filed in April, 1973, but it was not tried until April, 1974. While some evidence was submitted as to the 1973–1974 school year, it is incomplete and does not include the racial composition of the school staff.

22. The trial court awarded $100.00 to the following individuals: Herbert Williams, Willie Ann Lucas, Jewel Favors, L. W. Armstrong, Jewel Baker, Carol Terrell, A. C. Baker, L. D. Lucas, Laura Randolph, Leon Randolph, Melvin Bracely, Eddy Tucker, Clinton Terrell and Teressa Owens.

school year. Her salary has been consistently lower than that of Helen Printz, a White business education teacher. The salary differential was $450 in 1969–1970, $400 in 1970–1971, $350 in 1971–1972 and $300 in 1972–1973. While both have the same degree and the same number of years of teaching experience in the Brinkley School District, Printz has more years of teaching experience outside the District. The salary differentials can be explained by reference to the School District salary schedule which provides for a $50.00 increment for each year of teaching experience up to a maximum of $500.

Virginia Williams also contends that, unlike the White business education teachers, she was not given her own room and had to "float." This contention is not supported by the record. She admits that Elma Williams, one of the White business education teachers, also had to float during the 1973–1974 school year. Dewey Snowden, the present superintendent, testified that Printz also had to float [23] though perhaps not as much as she needed certain heavy equipment. He specifically mentioned two White nonbusiness education teachers who had to float and stated, "[w]e've got a lot of folks that have to move around because we are just not financially able to set everybody up and we don't have rooms for them to have their own room."

Her final contention is that she was not given an opportunity to sponsor any school organizations or to participate in any program which would involve extra pay. Again, the record refutes her contention. The sponsorship of the Future Business Leaders of America, a position involving no extra pay, was originally given to Elma Williams. When Virginia Williams was offered the position, she responded that Printz was better qualified because she had experience in the area. After complaining, Virginia Williams was also offered an opportunity to participate in the Office Occupational Program, a position which did involve extra pay, if she would get additional

training. She testified that if she had been able to take the extra training, she would have been able to participate in the programs.

■ After reviewing the record, we conclude that the defendants have rebutted the presumption in favor of individual relief with respect to Virginia Williams' claims that the salary differentials, the floating and the denial of opportunity for extra work were racially discriminatory.

*Donald Massey*

Donald Massey claims that he was discriminated against with respect to job assignment and promotion. He was first employed by the School District in 1969. He has a B.S. degree and is certified to teach at the secondary level. While with the School District, he taught science classes at the junior and senior high levels. Massey was offered a position for the 1973–1974 school year, but he refused it and is now teaching in another school district.

Massey contends he was denied a position in the summer work program, a position as a school bus driver, a position as an assistant principal and the chairmanship of the biology department. He also contends he was denied his request for a homeroom and had to "float." On the basis of this record, we cannot say that Massey is entitled to relief with respect to any of these claims. Herbert Smith, the former superintendent, testified that Massey was denied employment in the summer work program because he was already employed in the summer school program. We also note that two Black faculty members, Robert Manson and Herbert Williams, were offered employment in the summer work program. There is little or no evidence in the record with respect to employment of teachers as bus drivers and, thus, we cannot say Massey was entitled to such a position. Massey had no administrative experience, nor had he taken any courses in the area of school administration. While the School District

---

**23.** This is not necessarily inconsistent with the testimony of Virginia Williams that Helen

Printz did not have classes both upstairs and downstairs.

did employ uncertified individuals as principals, those individuals generally had either some prior administrative experience or had completed some course work towards administrative certification. Thus, we cannot say that Massey was entitled to be an assistant principal. There is evidence in the record that Brinkley School District did not have department chairmen. Since Massey himself testified that no extra pay was involved, we fail to see how he was injured even if the position existed. We have already discussed the problem of floating with respect to Virginia Williams. The defendants have established that the School District suffered from a lack of space and that both Blacks and Whites had to float.

After reviewing the record, we conclude that the defendants have rebutted the presumption in favor of individual relief with respect to Donald Massey's claims that the job assignments, promotions and floating were racially discriminatory.

*Mary Manson*

Mary Manson is the only unsuccessful applicant for a faculty position with the Brinkley School District seeking individual relief in this action. She received her B.S. degree in business education in 1965 and is certified as a high school business education teacher. She taught junior high math for one year in the Holly Grove School District. The School District has employed her husband, Robert Manson, since the 1969–1970 school year. The School District has no stated policy prohibiting the employment of both husband and wife.

In late November, 1969, she submitted a written application for a faculty position to the then Superintendent Herbert Smith. She also went to his office to discuss possible employment. Smith advised her to become certified in elementary education by taking additional courses. Before the 1970–1971 school year, she again submitted

a written application and discussed employment opportunities with Smith. She requested that her application be left on file with respect to any future faculty vacancies. She again contacted Smith about employment in 1971–1972 and was again denied employment as a member of the faculty. It is clear from the testimony of Smith that she was denied employment as a faculty member [24] because of the District's practice of hiring Black applicants to replace Black faculty members:

Q. [Mr. Walker, counsel for plaintiffs] Now, during this period of time you had this policy operative, didn't you, that if blacks left the system, you replaced them with blacks, and if whites left the system, you replaced them with whites, isn't that correct?

A. [Herbert Smith, Superintendent of the Brinkley School District] Generally speaking.

Q. And during this period no black left the system so you didn't put her in a job, did you?

A. I believe that's right.

Q. And if a black had left the system, you would have put her in that job because of your previous commitment to her, wouldn't you have?

A. I believe so.

Q. But whites did leave the system and you replaced them with whites, and you did not consider Mrs. Manson for any of the positions that you hired whites for, did you?

A. That's true.

Q. I see. Now, during that period of time you did hire some whites who held emergency certificates or who otherwise were out of their field, didn't you?

A. That's probably true, I'm sure.

It is argued that Mary Manson was not hired because she was not certified. We find no support in the record for this

---

24. In the Spring of 1970, she worked as an aide substituting in the classroom. In the fall of 1971, she worked as a temporary aide in the School District for one month. She was again offered an aide position in November, 1971, but she only worked for two weeks because she was able to obtain a better job teaching business education for the Manpower Program in Forrest City.

contention. From the 1970–1971 to the 1972–1973 school year, the School District employed eight uncertified White teachers but only three uncertified Black teachers. Neither the handbook on "Administrative Policies of the Brinkley Public Schools" for 1968 nor the one for 1972 contained a requirement for certification.[25] We recognize that the requirement of an appropriate certification can be a valid nondiscriminatory reason for not hiring a teacher. *Cf. Moore v. Board of Ed. of Chidester Sch. Dist. No. 59, Ark., supra* at 713; *Jackson v. Wheatley Sch. Dist. No. 28 of St. Francis Co., Ark.,* 430 F.2d 1359, 1364 (8th Cir. 1970). However, as we held in *Moore v. Board of Ed. of Chidester Sch. Dist. No. 59, Ark., supra,* "the principle is one which must be applied in a nondiscriminatory manner if it is to be applied at all." *Id.* at 713–714. Moreover, there were thirty-one vacancies at the beginning of the 1970–1971 school year, including nine at the elementary level. Blacks were hired to fill only two of the vacancies for that year. Blacks filled only four of the sixteen vacancies for the 1970–1971 school year, and only one of the twenty-two vacancies for the 1972–1973 school year. We conclude that the defendants have not rebutted the presumption of discrimination with respect to Mary Manson for the school years through 1972–1973 and that she is entitled to relief for those years.

█ Mary Manson has an alternative basis for relief for the school years through 1972–1973. The trial court concluded that she had not "been deprived of her employment at the school solely because she's black." It denied relief because it felt that lack of certification was also a factor. The trial court erred in employing the sole basis standard. It is sufficient if it is demonstrated that race was a factor in the employment decision. *See Arlington Heights*

*v. Metro. Housing Corp., supra; Clark v. Mann, supra; Wade v. Mississippi Co-op Extension Service,* 528 F.2d 508 (5th Cir. 1976). *Cf. Williams v. Matthews,* 499 F.2d 819, 826 (8th Cir. 1974); *Langford v. City of Texarkana, Arkansas,* 478 F.2d 262, 268 (8th Cir. 1973); *Smith v. Board of Education of Morrilton Sch. Dist. No. 32,* 365 F.2d 770, 780 (8th Cir. 1966). The testimony of Smith clearly demonstrates that race was a significant factor in his decision not to hire Mary Manson. The defendants have attempted to justify their failure to hire Mary Manson by showing that she was not certified in a field in which there were vacancies and, thus, she would not have been hired even if race had not been considered. The defendants cannot escape liability on that basis since there is also evidence in the record that certification was not uniformly required by the School District and that several White uncertified teachers were employed by the School District in the years she sought a faculty position.

Two questions remain with respect to Mary Manson: first, is she entitled to back pay for any school year after 1972–1973; and, second, is the School District obligated to make her an offer of employment at this time. On the basis of this record, we cannot answer either question.

█ While Mary Manson is not entitled to the benefit of any presumption for the school years after 1972–1973, she is, nonetheless, entitled to relief if she establishes that race was a factor in any decision not to offer her a faculty position in those years. On remand, the trial court will have to consider this question in light of the standard set forth in this opinion.

█ Mary Manson is entitled to employment at this time if she meets or can meet

---

25. Both the 1968 and the 1972 handbooks on "Administrative Policies of the Brinkley Public Schools" provide:

 1. In order to be eligible for employment in the Brinkley Public Schools a teacher must meet the following qualifications:

 a. It is the desire that all teachers have [sic] minimum the Bachelor's Degree. However, an exception may be made by the su-

perintendent of schools for grades below the high school level under the provisions of the rules and regulations of the State Department of Education.

 \* \* \* \* \* \*

 c. *Professional Material:* Teachers should have had training for the specific field in which they teach.

current educational standards and unless she was unconditionally offered employment after the 1972–1973 school year. She had requested that her application remain on file and could not reasonably have been expected to continue to make personal application for employment as a faculty member in the face of repeated denials. On remand, the trial court must determine whether such an offer was made.

*Robert Manson*

Robert Manson contends that he was discriminated against with respect to salary and job assignment. He was first employed by the Brinkley School District in 1969. He had a B.S. degree with a major in physical education. During his first two years with the School District, he taught science at the Marion Anderson School. He had an emergency certificate. In the 1971–1972 and 1972–1973 school years, he taught geography at the high school level. He was certified for this position.

During the 1969–1970 school year, Manson served as the head basketball and the junior football coach at Marion Anderson. His salary for that year[26] was less than that of Dewey Snowden, the White head basketball coach, Richard Wilkerson, the White junior basketball coach, Travis Giles, the White assistant football coach[27] and Jerry Harrell, the White junior football coach, even though he had both basketball and football coaching responsibilities while the White coaches had responsibilities in only one sport. The salary differential between Manson and Snowden is partly explained by the fact that Snowden had a Master's degree, more years of experience with the School District, and was serving as principal of Brinkley Junior High. The differentials between the salary of Manson and the salaries of Wilkerson, Giles and

Harrell cannot be explained on these grounds.

In the school year after unitization, Manson served as an assistant football coach. During that school year, he received a lower salary than any assistant White coach. During the 1971–1972 and 1972–1973 school years, Manson served as an assistant junior football coach. In those years, his salary was less than any White coach[28] except Wayne Lindley, an assistant junior football coach with two years less experience.

The defendants only justification for the salary differentials is that they resulted from individual negotiations. We cannot accept this justification when the evidence demonstrates that the School District systematically paid Blacks less than Whites in similar positions. *See Arkansas Ed. Ass'n v. Board of Ed., Portland, Ark. Sch. Dist.,* 446 F.2d 763, 770 (8th Cir. 1971); Appendix A. Moreover, there is evidence in the record that the superintendent and the Board of Education set salaries without consultation with individual faculty members.

Manson also claims that since he was the head basketball coach at the Black school, he should have been considered for that position at the unitized school. Manson was offered the position of head basketball coach in 1974. On the basis of this record, we cannot say, as a matter of law, that he should have been offered the position before that time. Snowden, who became the head coach at unitization, had greater experience as a head coach than Manson. When Snowden became superintendent, Wilkerson was appointed head basketball coach. Unlike Manson, Wilkerson had no experience as a head coach. He did have six years experience as the junior basketball coach and three years as a senior assistant basketball coach. Manson did not have similar experience coaching basketball as he had

---

26. Manson's salary for the 1969–1970 school year is given as $6,252 on Defendants' Exhibit 12, and as $6,608 on the staff list submitted by the School District in response to the plaintiffs interrogatories. The staff list also gives his monthly salary which would be consistent with a total salary of $6,008.

27. *See* Appendix A.

28. The record is again unclear as to Manson's salary for the 1970–1971 school year. Defendants' Exhibit 12 lists his salary as $6,608. The staff list submitted by the School District gives the salary as $6,252. *See* Appendix A for the salary comparison.

switched to coaching football at the unitized school.

■ The defendants have not rebutted the presumption in favor of individual relief with respect to claims of salary discrimination by Robert Manson, but they have rebutted the presumption with respect to his claims of discriminatory job assignment.

*Herbert Williams*

Herbert Williams also contends that he was discriminated against with respect to salary and job assignment. He was first employed by the Brinkley School District in 1964. He has a B.S. degree and was certified to teach at the high school level. From 1967 to 1970, he served as the head football coach at Marion Anderson School. In the 1969–1970 school year, he also served as the head junior basketball coach at Marion Anderson School. Since unitization, he has served as an assistant football coach. He also served as an assistant basketball coach for the 1970–1971 and 1972–1973 school years.

In the 1969–1970 school year, Williams received $6,200, a salary lower than that received by any of the White coaches.[29] Williams had responsibilities in two sports while the White coaches had responsibilities in only one sport. As with Robert Manson, the salary differential between Williams and Snowden is explainable on the basis of a higher degree, more experience and greater responsibility. However, the differentials between the salary of Williams and that of Wilkerson, Giles and Harrell cannot be explained on those grounds. In the years after unitization, Williams' salary was lower than that of any of the White coaches except that of Wayne Lindley, who had less experience than Williams. Again, the defendants seek to justify the salary differentials as resulting from individual negotiation. As previously indicated, negotiation is not a sufficient justification.

Williams also claims that since he was the head football coach at the Black school, he should have been considered for a head coaching position at the unitized school. Williams was offered the position of head track coach at the time of trial. We cannot say, as a matter of law, that Williams was entitled to a head coaching position before that time on the basis of this record. When he was the head coach at Marion Anderson School, his team was placed on probation for allowing an ineligible student to participate in the athletic program. Smith, Snowden and Robert Hattabaugh testified at trial with respect to dissatisfaction with Williams' performance as a coach. In May of 1973, Williams received a "definitely unsatisfactory" overall evaluation of his performance as an athletic coach from Hattabaugh.

The defendants have not rebutted the presumption in favor of individual relief with respect to Herbert Williams' claims of salary discrimination, but they have rebutted the presumption with respect to his claims of discriminatory job assignment.[30]

*Leon Randolph*

Leon Randolph contends that he was discriminated against with respect to salary. He has been employed by the Brinkley School District since 1958. He taught math until 1966, when he received his Master's degree in guidance and began counseling. In the 1969–1970 school year, he served as the principal of Marion Anderson School. When the School District was unitized, he was not given a principalship but instead was returned to counseling. In the 1971–1972 school year, he became an assistant principal. He took additional courses in administration and was certified as a secondary principal sometime after unitization.

■ During the 1969–1970 school year, Randolph, as principal of the all-Black Marion Anderson School, received a substantially lower salary than that received by any of the three White principals of the predominantly White Brinkley schools. Randolph received $7,400, while James Nix, the high

---

**29.** *See* Appendix A.

**30.** We find no merit to Williams' claims with respect to employment in the summer work program.

school principal, received $10,700.[31] Dewey Snowden, the junior high principal, received $9,000 and William Heinley, the elementary principal, received $8,800. Randolph received the same salary as Leroy Sutherland, a White, who served as the elementary principal at Marion Anderson School. Nix, Snowden and Sutherland all had Master's degrees in administration, were certified as principals and had some administrative experience. Snowden also served as the head basketball coach. Heinley, however, had a B.A. degree, no administrative experience and was not certified as a principal. The defendants have clearly failed to rebut the presumption that arose in favor of individual relief with respect to Randolph's claim of salary discrimination for the 1969–1970 school year. On the basis of this record, however, they have rebutted the presumption with respect to relief for the succeeding years. When Randolph returned to counseling in the 1970–1971 school year, he made more than the White counselor, Mary Henderson. As an assistant high school principal during the 1971–1972 school year, he received more than the other assistant principal, Glen King, who did not yet have his Master's degree. He received the same amount as the elementary assistant principal, Richard Day, who did have his Master's. He received less than Heinley, Nix and Snowden, all of whom had their Master's and more experience. In the 1972–1973 school year, he received a higher salary than all but two of the principals in the School District. Only Snowden, the junior high principal, and Charles Willhite, the high school principal, received a higher salary.

*Julius Anderson*

Julius Anderson was first employed by the Brinkley School District, in 1971, as an elementary science teacher. He had student taught in the School District under Herbert Williams in the Spring of 1970, and had unsuccessfully applied for a faculty position for the 1970–1971 school year. While teaching, he went to school part-time and completed work on his Master's degree in administration which he completed in 1973. In the Spring of 1974, he signed a form indicating he did not plan to return for the 1975–1976 school year. At trial, Anderson testified he would be willing to return to the School District if he was given an opportunity to advance.

Anderson majored in physical education and was interested in becoming an assistant coach in any sport other than football. While at college, he did not participate in varsity sports but he did participate in intramural sports. Anderson spoke to Dewey Snowden about becoming an assistant basketball coach but did not obtain the position. In the 1970–1971 and the 1972–1973 school years, both Williams and Richard Wilkerson assisted Snowden in basketball. However, in the 1971–1972 school year, only Wilkerson assisted, thus creating an opening for a basketball assistant coach in that year. In the 1973–1974 school year, Larry Crumby was a junior and senior assistant basketball coach and P. T. Waller was the junior head coach.

 Anderson was not considered for an administrative position. He reported to the School District that he had received his Master's before the start of the 1973–1974 school year, but he never formally applied for an administrative position. The record reveals that four White principals were hired for the 1972–1973 school year, at least two of whom were not certified in school administration. There is evidence in the record that the School District recruited individuals it believed to have an administrative potential for positions as principals rather than relying on applications. Anderson testified that he was discouraged from applying for an administrative position based upon his past unsuccessful attempts

---

**31.** Nix received a base salary of $8,200. It was stipulated at trial that his salary was supplemented by $2,500 a year from additional sources, such as the Head Start and Neighborhood Youth Corps programs. The supplements continued up to and including the 1970–1971 school year. When the supplements ceased, Nix was given a raise to $11,700 for the 1971–1972 school year.

to obtain a coaching position. We also note that since the 1969–1970 school year, only one of the thirteen individuals holding an administrative position has been Black. As the Supreme Court stated in *International Brotherhood of Teamsters v. United States, supra,*

> [i]f an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his workforce from which he has discriminatorily excluded members of minority groups. When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.

*Id.* 431 at 365–366, 97 S.Ct. at 1870 (footnotes omitted). *See also Dothard v. Rawlinson,* —— U.S. ——, ——, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

Thus, we cannot say that Anderson's claim is necessarily barred by his failure to apply for an administrative position.

On remand, the trial court shall first determine whether Anderson failed to apply for an administrative position because it would be fruitless. The trial court shall next examine the qualifications and experience of other assistant coaches hired and of those individuals selected for promotion to administrative positions. If Anderson's qualifications and experience are equivalent, then he is to be offered the first coaching or administrative vacancy for which he is qualified. *See Clark v. Mann, supra; Moore v. Board of Ed. of Chidester*

*Sch. Dist. No. 59, Ark., supra* at 714–715; *Smith v. Board of Education of Morrilton Sch. Dist. No. 32, supra* at 784.

*Eddie Tucker*

Eddie Tucker claims that he was discriminated against with respect to promotion and opportunity for summer employment. He was first employed by the Brinkley School District in 1967.

Tucker was given substantial administrative responsibilities for about a year and a half when Leroy Sutherland, the elementary principal at Marion Anderson School, became terminally ill. The trial court denied relief because Tucker had not informed either the superintendent or those in responsible positions of his desire to become involved in school administration. As we have already indicated, the failure to make formal application does not necessarily bar relief. The record contains evidence with respect to several White individuals with administrative potential who were promoted even though they were not certified in administration. On remand, the trial court shall first determine whether Tucker failed to apply for an administrative position because it would be fruitless. The trial court shall next examine the academic qualifications and experience of Tucker and those individuals selected for promotion to administrative positions. If Tucker's qualifications and experience are equivalent, then he is to be offered the first administrative vacancy for which he is qualified under the current policies of the School District. *See Clark v. Mann, supra; Moore v. Board of Ed. of Chidester Sch. Dist. No. 59, Ark., supra* at 714–715; *Smith v. Board of Education of Morrilton Sch. Dist. No. 32, supra* at 784. If the School District now has a uniformly applied policy of requiring administrative certification, then he is to be afforded a reasonable period of time to obtain certification.

Tucker also claims he was denied the opportunity to teach math in summer school during the Summer of 1973. On the basis of the evidence in the record, we cannot say Tucker was entitled to relief

with respect to this claim. Tucker was not certified to teach math although he had done so during the school year. The summer school math position went instead to Theether Alexander, a Black, who was certified.

*Leroy Randolph*

Leroy Randolph was the band director at the Marion Anderson School for the 1968–1969 and 1969–1970 school years. He was employed by the School District on a nine-month basis and received $5,500 for the 1968–1969 school year and $5,658 for the 1969–1970 school year. His salary was substantially lower than that of Jon Barbarotto, the White band director at Brinkley High School for both years. Barbarotto was employed on a ten-month basis and received $7,800 in 1968–1969 and $7,908 in 1969–1970. Steven Ruff and John Arnhart, who were White band directors at Brinkley Junior High School also received higher salaries. Ruff received $6,500 for the 1968–1969 school year and Arnhart received $6,400 for the 1969–1970 school year. While Barbarotto has a greater number of years of teaching experience, that alone does not justify the differential, nor does any difference in education justify the differential as all have Bachelor's degrees and are certified to teach at the high school level.

The defendants have offered no justification for the salary differential. They contend, however, that proof at trial established that Randolph broke his employment contract and left the School District in the middle of the 1969–1970 school year without notice to the School District. We are unable to find any reference to his leaving except in the Defendants' Post Trial Memorandum. On remand, the trial court shall determine if Randolph did leave during the middle of the year. If he did not leave, then he is entitled to an award of back pay for the differential between his salary and that of the White band directors not explained by greater experience and not barred by the statute of limitations.

*A. C. Baker*

A. C. Baker was first employed by the Brinkley School District in 1962. He has a B.S. degree in agriculture and is certified to teach at the secondary level. In the 1969–1970 school year, he taught agriculture on a twelve-month basis. He received $6,308 while Gary Cooper, the White agriculture teacher, received $7,100. Cooper also taught on a twelve-month basis, had a B.S. degree in agriculture and was certified to teach at the secondary level. He had been employed by the School District since 1964. In the 1971–1972 school year, Baker received $6,810 for teaching on a twelve-month basis. Hugh Weatherford, the White agriculture teacher, received $7,000 for teaching agriculture on a ten-month basis. Weatherford had a B.S. degree in agriculture but he was not certified. He was first employed by the School District in 1971. The salary differentials cannot be explained on the basis of higher degrees or greater experience. In the Defendants' Post Trial Memorandum, they state that Baker had been relieved of his instructional duties and was at that time teaching eighth grade science. However, Baker is listed as an agriculture teacher for both years in the defendants' answer to Interrogatory No. 5, which was admitted as an exhibit at trial. On remand, the trial court shall determine if Baker was still teaching agriculture. If he was, then he is entitled to an award of back pay for the differentials between his salary and that of the White agriculture teachers not explained by greater experience and not barred by the statute of limitations.

### III

The trial court ordered the School District to adopt a uniform salary schedule and objective standards to be used in assigning, promoting and hiring professional personnel. The School District adopted, and the trial court approved, a salary schedule for administrative, specialty, vocational, teaching and coaching personnel. The schedule provides for a base salary with increments for a Master's degree, and for each year of

**1100**

experience up to ten years. The schedule also establishes a set amount to be paid in addition to the base salary for each of the specialty, vocational and coaching positions. No issues are raised on appeal with respect to the schedule.

However, the plaintiffs do complain on appeal that the School District failed to formulate objective standards to be used in assignment, promotion and hiring of faculty members other than coaches. We find no explanation in the record for the School District's failure to submit such standards. On remand, the School District is to comply with the trial court's order. *See Moore v. Board of Ed. of Chidester Sch. Dist. No. 59, Ark., supra* at 712–713; *Haney v. County Board of Education of Sevier County, supra* at 372. *See also United States v. Texas Education Agency*, 459 F.2d 600, 607 n. 3 (5th Cir. 1977); *Singleton v. Jackson Municipal Separate School Dist.*, 419 F.2d 1211, 1218 (5th Cir. 1970).

 The School District did submit a list of criteria to be used in the evaluation of coaches,[32] presumably for the purposes of assignment and promotion. The trial court approved the criteria. In our view, however, the criteria fail to satisfy the mandate of *Moore v. Board of Ed. of Chidester Sch. Dist. No. 59, Ark., supra*, since they are primarily subjective in form and are certainly capable of subjective application. It is clear in this Circuit

> that a board of education is obligated to use objective nondiscriminatory standards in the employment, assignment and dismissal of teachers. A board may also

consider established and previously announced nondiscriminatory subjective factors in making such decisions. We emphasize, however, that:

> " * * * race per se is an impermissible criterion for judging either an applicant's qualifications or the district's needs. And this applies equally to considerations described as environment or ability to communicate or speech patterns or capacity to establish rapport with pupils when these descriptions amount only to euphemistic references to actual or assumed racial distinctions. * * * "

*Smith v. Board of Education of Morrilton Sch. Dist. No. 32, supra* 365 F.2d at 782. Furthermore, subjective standards carry little weight in meeting the board's burden to prove clearly and convincingly that it is not discriminating[.]

*Id.* at 713.

Among the objective criteria that should be considered are the degree or degrees held, the number of years of experience, participation in workshops or seminars on sports coaching, total sports coaching experience, college sports participation, and experience in the administration of athletic programs. *See United States v. Texas Education Agency, supra* at 607 n. 3.

### IV

 The defendants, the superintendent and members of the School Board contend that they are immune from any damage award under 42 U.S.C. § 1983 because at the time the challenged employment deci-

---

**32.** *CRITERIA TO BE USED IN THE EVALUATION OF COACHES*

1. Personality—Suitability for job.
2. Personal Appearance: Impression individual makes on others.
3. Attendance: Being at practice, meetings and games on time. Conforming to work hours set by Head Coach.
4. Cooperation with Rest of Staff: Working with and getting along with the other members of the coaching staff.
5. Dependability: The ability to do required jobs with minimum of supervision or instruction.
6. Job Knowledge: Being knowledgeable enough on work duties to do a good job.

7. Quantity of Work: Amount of work done in a work day.
8. Stability: Able to stand the pressure and remain calm at all times; and continue putting forth good effort despite set backs.
9. Leader: Setting good examples on and off the job for players to follow.
10. Punctuality: Arriving promptly for all appointments.
11. Won-loss Record.
12. Compliance with job description for athletic coaches.

Each category above will be graded "excellent", "satisfactory", or "unsatisfactory" according to the individual's performance.

sions were made, they were not in violation of then settled and unquestioned constitutional law. State and local executive or administrative officials are accorded only a qualified immunity from liability, under 42 U.S.C. § 1983.[33] *Wood v. Strickland, supra; Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). *See also Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

█ When *Wood v. Strickland, supra*, is read together with *Scheuer v. Rhodes, supra*, it is clear that the defense of qualified immunity involves both proof of the defendant's state of mind and of the reasonableness of his conduct. *See Developments in the Law—Section 1983 and Federalism*, 90 Harv.L.Rev. 1133, 1213 (1977). In *Scheuer v. Rhodes, supra*, the Supreme Court declined to find that the governor of Ohio and various officials and members of the National Guard were absolutely immune from a § 1983 action brought by the personal representatives of the students killed during demonstrations at Kent State University. Instead, they were accorded a qualified immunity which depended upon,

> the scope of discretion and responsibility of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is * * * based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

*Id.* 416 U.S. at 247–248, 94 S.Ct. at 1692. In *Wood v. Strickland, supra*, the Court expanded upon the meaning of "good faith" and found that it had both a subjective and an objective element. It held that the defendant school officials would not be immune from liability under § 1983 if they knew, or reasonably should have known, that the action taken would violate constitutional rights or if the action was taken with the malicious intention to cause a deprivation of constitutional rights. *Id.* at 322, 95 S.Ct. 1001. While school officials are not "charged with predicting the course of constitutional law," *ibid*, citing *Pierson v. Ray, supra* 386 U.S. at 557, 87 S.Ct. 1213, they are to be held to a standard of conduct based upon knowledge of basic and unquestioned constitutional rights.

█ The defendants in this case contend that their racially discriminatory practices with respect to assignment, salary, promotion and hiring cannot be characterized as in violation of then unquestioned constitutional rights. We cannot agree. The defendants' argument belies the long line of court cases beginning with *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), which have held that separate schools are inherently unequal and that school boards are "charged with the affirmative duty to take whatever steps [that] might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green v. School Board of New Kent County*, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). *See, e. g., Swann v. Charlotte-Mecklenberg Bd. of Ed.*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Bradley v. School Board of Richmond*, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); *Griffin v. School Bd. of Prince Ed-*

---

**33.** The absolute immunity afforded legislators, *Tenney v. Brandlove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); judges, *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *cf. Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1872); and prosecutors, *Imbler v. Patchman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), defeats liability under § 1983 at the outset. A qualified immunity, however, depends upon the circumstances and motivations of the defendants' actions as established by the evidence at trial. *Imbler v. Patchman, supra* at 419, n. 13, 96 S.Ct. 984; *Scheuer v. Rhodes*, 416 U.S. 232, 242–249, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and is generally a matter of defense. *See Pierson v. Ray, supra* at 555–558, 87 S.Ct. 1213; *Glasson v. City of Louisville*, 518 F.2d 899, 907–910 (6th Cir.), *cert. denied*, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975); *Knell v. Bensinger*, 522 F.2d 720, 724 (7th Cir. 1975).

*ward*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). Moreover, it has long been the law in the Eighth Circuit that salaries must be equal for equal work, *Morris v. Williams*, 149 F.2d 703 (8th Cir. 1945); *see also* Equal Pay Act of 1963, 29 U.S.C. §§ 206(d) and 216(b), and that Black personnel cannot be disadvantaged on unitization. *See Moore v. Board of Ed. of Chidester Sch. Dist. No. 59, Ark., supra; Jackson v. Wheatley School District No. 28 of St. Francis Co., Ark., supra; Haney v. County Board of Education of Sevier County, supra; Smith v. Board of Education of Morrilton Sch. Dist. No. 32, supra*. Accordingly, the defendants cannot claim immunity from damages under § 1983 under the doctrine developed in *Scheuer v. Rhodes, supra*, and *Wood v. Strickland, supra*, since they were clearly on notice that their actions were in violation of the constitutional rights of both Black faculty members and Black applicants.

## V

■ The defendants contend that the trial court erroneously awarded attorneys' fees to plaintiffs' counsel. We must consider this issue in light of the Civil Rights Attorney's Fees Awards Act of 1976, Pub.L. No. 94–559 (Oct. 19, 1976), 42 U.S.C. § 1988, which was passed while the appeal in this case was pending. Under the Act, attorneys' fees may be awarded to the prevailing party in an action brought under 42 U.S.C. § 1983. Since the plaintiffs were successful in demonstrating a prima facie case of purposeful racial discrimination and the trial court found intentional discrimination and awarded individual and injunctive relief, they would be considered to be prevailing parties. It is clear from the legislative history of the Act that Congress intended it to apply to all pending cases, including cases pending on appeal. *See* 122 Cong. Rec. 17,052 (daily ed. Sept. 29, 1976), and 12,155, 12,160 and 12,667 (daily ed. Oct. 1, 1976). *See also Bradley v. School Board of*

*Richmond, supra; Finney v. Hutto*, 548 F.2d 740, 742 (8th Cir. 1977). Thus, the award of attorneys' fees was appropriate in this case.

The plaintiffs' counsel are awarded $2,500 for their services on this appeal.

## · THE REMEDY

*Mary Manson* is entitled to an award of back pay for the 1970–1971 through the 1972–1973 school years. The award shall be based on the differential between the salary paid to teachers having comparable degrees and experience to that of Manson and the sum earned by Manson during the period in question. *See Clark v. Mann, supra; Moore v. Board of Ed. of Chidester School Dist. No. 59, Ark., supra* at 714–715; *Smith v. Board of Education of Morrilton Sch. Dist. No. 32, supra* at 784. Unless the trial court finds that Manson has received an unconditional offer of employment as a member of the faculty of the School District, she is to be offered the first vacancy for which she is currently qualified. If the School District's policy currently requires that all teachers be certified, she is to be afforded a reasonable period of time to obtain certification.[34]

*Robert Manson* and *Herbert Williams* are entitled to an award of back pay for that portion of the 1969–1970 school year not excluded by the statute of limitations and for the school years 1970–1971, 1971–1972 and 1972–1973. The awards shall be based on the differential between their salaries and the salaries of the White assistant coaches having the most comparable position, degree and experience for each of the years in question.

*Leon Randolph* is entitled to an award of back pay for that portion of the 1969–1970 school year not excluded by the statute of limitations. The award shall be based on the differential between Randolph's salary and the salary of William Heinley, the White principal having the most comparable position, experience and qualifications.

---

**34.** The State of Arkansas Department of Education adopted a policy restricting the use of uncertified teachers effective January 1, 1974.

*Leroy Randolph, A. C. Baker, Julius Anderson* and *Eddie Tucker* are entitled to have their cases reexamined by the trial court in the light of the views expressed in this opinion. This review can either be on the basis of the existing record or on the basis of this record as supplemented by such additional evidence as the trial court may feel appropriate. If the court determines that one or more of the individuals is entitled to relief, the award shall be consistent with the views expressed herein.

The trial court shall direct the School District to resubmit its criteria upon which coaches are to be evaluated in accord with this opinion. The trial court shall also direct the School District to submit objective standards in accord with this opinion to be used in assignment, promotion and hiring of the School District's administrative, specialty, vocational and teaching personnel.

The judgment of the District Court is affirmed in part and reversed in part. The matter is remanded to the trial court for action not inconsistent with this opinion. Attorneys' fees in the sum of $2,500 are awarded to the plaintiffs for services rendered on this appeal. Each party shall bear its own costs on appeal.

## APPENDIX A

| Name of Teacher | Race | Salaries | | | | Highest Degree | Date Hired | Subject |
|---|---|---|---|---|---|---|---|---|
| | | 69–70 | 70–71 | 71–72 | 72–73 | | | |
| **Administrative:** | | | | | | | | |
| **Superintendents** | | | | | | | | |
| Smith | W | $12,000 | $18,200 | $14,200 | $14,200 (½ yr) | M.A. | 1967 | Superintendent |
| Snowden | W | | | | 14,200 (½ yr) | M.S.E. | 1955 | Superintendent |
| **Principals** | | | | | | | | |
| Nix | W | 8,200 | 8,200 | 11,700 | | M.Ed. | 1967 | H.S. Prin. |
| Snowden | W | 9,000 | 9,600 | 11,000 | 12,000 (½ yr) | M.S.E. | 1955 | 69–70 & 71–73 Jr.H. Prin., 70–71 H.S. Asst. Prin. |
| Heinley | W | 8,800 | 9,400 | 10,400 | | B.A. | 1969 | Elem. Prin. |
| Day | W | | 9,000 | 9,500 | | M.S.E. | 1970 | Elem. Asst. Prin. |
| King | W | | 7,600 | 8,100 | 9,500 | B.S.E. | 1970 | H.S. Asst. Prin. |
| Hill | W | | 9,200 | | | B.S.E. | 1970 | Jr.H. Prin. |
| Rasp | W | | | | 7,060 | B.S. | 1969 | Jr.H. Asst. Prin., Prin. in 1973 |
| Waller | W | | | | 11,000 | M.Ed. | 1972 | Elem. Prin. |
| Fisher | W | | | | 8,360 | B.S. | 1970 | Elem. Asst. Prin. |
| Willhite | W | | | | 11,500 | M.A. | 1972 | H.S. Prin. |
| Sutherland | W | 7,400 | | | | M.A. | 1960 | Elem. Prin. |
| Randolph, Leon | B | 7,400 | | 9,500 | 11,300 | M.S.E. | 1969 | 69–70 H.S. Prin., 71–73 Asst. H.S. Prin. |
| **Specialty:** | | | | | | | | |
| **Home Economics** | | | | | | | | |
| Ferrel | W | 6,658 | 6,760 | | | M.S.H.Ec. | 1952 | Home Ec. |
| McGrew | W | | | 7,200 | | M.S.H.Ec. | 1971 | Home Ec. |
| Bake | B | 6,308 | 6,410 | 6,810 | 7,410 | B.H.Ec. | 1953 | Home Ec. |
| **Music-Band** | | | | | | | | |
| Barbarotto | W | 7,908 | 8,010 | 8,410 | 8,810 | B.Mus.Ed. | 1964 | Sr. Band |
| Arnhart | W | 6,400 | | | | B.Mus.Ed. | 1969 | Jr. Band |
| Alexander | W | | | 7,000 | 7,450 | B.Mus.Ed. | 1970 | Jr. Band |
| Randolph, LeRoy | B | 5,658 | | | | B.Mus.Ed. | 1968 | Sr./Jr. Band |
| **Choral** | | | | | | | | |
| Pruett | W | | 6,100 | 6,550 | | B.Mus.Ed. | 1970 | Choral |
| Dial | W | | | | 6,610 | B.Mus.Ed. | 1972 | Choral, Dr.Ed. |
| **Guidance Counselors** | | | | | | | | |
| Henderson | W | 6,848 | 7,155 | 7,555 | | M.S.E. | 1967 | Counseling |
| Parrish | W | | | | 7,500 | M.S.E. | 1972 | " |
| Randolph, Leon | B | | 8,000 | | | M.S.E. | 1967 | " |
| Terrell | B | | | 6,360 | 7,410 | B.S. | | " |

| | Name of Teacher | Race | Salaries | | | | Highest Degree | Date Hired | Subject |
|---|---|---|---|---|---|---|---|---|---|
| | | | 69–70 | 70–71 | 71–72 | 72–73 | | | |
| Athletics: | | | | | | | | | |
| Basketball | Snowden | W | 9,000 | 9,600 | 11,000 | 12,000 | M.S.E. | 1955 | Head |
| | Wilkerson | W | 6,800 | 7,000 | 7,450 | 8,400 | B.S.E. | 1967 | 69–73 Jr. Head, 71–73 Asst. Sr. |
| | Williams | B | 6,200 | 6,352 | | 7,450 | B.S. | 1964 | 69–70 Jr. Head, 70–71 & 72–73 Asst. Sr. |
| Football | Schmidt | W | 8,500 | 9,100 | | | B.S.E. | 1965 | 69–71 Head |
| | Tune | W | | 8,000 | 9,300 | | B.S.E. | 1968 | 69–70 Asst., 70–71 Head |
| | Giles | W | 7,358 | | | | B.S.E. | 1968 | Asst. Sr. |
| | Harrell | W | 6,800 | | | | B.S.E. | 1969 | Jr. Head |
| | King | W | | 7,600 | | | B.S.E. | 1970 | Jr. Head |
| | Hattabaugh | W | | | 8,000 | 9,000 | B.S.E. | 1970 | 71–72 Asst. Sr., 72–73 Head |
| | Hays | W | | | 7,800 | | B.S.E. | 1970 | Asst. Sr. |
| | Galloway | W | | | 7,700 | 8,100 | B.A. | 1970 | Jr. Head |
| | Lindley | W | | | 6,700 | 7,160 | B.S.E. | 1971 | Asst. Jr. |
| | White | W | | | | 8,400 | B.S.E. | 1972 | Asst. Sr. |
| | Williams | B | 6,200 | 6,352 | 7,000 | 7,450 | B.S. | 1964 | 69–70 Head; 70–73 Asst. Sr. |
| | Manson | B | 6,008 | 6,252 | 6,900 | 7,350 | B.S. | 1969 | 69–70 Head Jr., 70–71 Asst. Sr., 71–73 Asst. Jr. |
| Track | White | W | | | | 8,400 | B.S.E. | 1972 | Head |