Elvin **BARCHERS**, Plaintiff,

v.

**UNION PACIFIC RAILROAD COMPANY and United Transportation Union, Defendants.**

**No. 89–0935–CV–JWO–3.**

United States District Court,
W.D. Missouri, W.D.

June 18, 1991.

Arthur A. Benson, II, Benson & McKay, Kansas City, Mo., for plaintiff.

Jay Michael Nadlman, Union Pacific R. Co.–Law Dept., North Kansas City, Mo., Douglas C. Herbert, Washington, D.C., for defendant Union Pac. R. Co.

G. Michael O'Neal, Hubbell, Sawyer, Peqak & O'Neal, Kansas City, Mo., Clinton J. Miller, United Transp. Union, Asst. Gen. Counsel, Cleveland, Ohio, for defendant United Transp.

## MEMORANDUM OPINION AND ORDER

ELMO B. HUNTER, Senior District Judge.

After reviewing the parties' suggestions relative to defendants' motion to dismiss or in the alternative for summary judgment, the Court raised *sua sponte* the question of plaintiff's standing to assert the claims of age discrimination which he has made in this case. For the reasons stated below, the case is dismissed because plaintiff lacks standing to assert the claims, and the Court, therefore, lacks subject matter jurisdiction over the action.

## BACKGROUND

Barchers was a conductor and brakeman for Union Pacific until his retirement on September 28, 1988. At the time of his retirement, Barchers was 63 years old. During the time of his employment, Barchers was represented by the United Transportation Union ("the Union") for collective bargaining purposes.

On August 3, 1987, Union Pacific and the Union entered into an agreement which was applicable to Barchers and which went into effect on October 1, 1987. The agreement established a "reserve board" for employees, designed to reduce the number of older workers in railyards. Reserve board status was not imposed on anyone; participation was voluntary. Only a limited number of employees could join the reserve board, selection for which was made on the basis of seniority: the most senior employee applying for the reserve board would be selected to fill the vacancy. Employees who joined the board were not required to perform any work duties, unless recalled to active duty, and they received a percentage of the active duty salary. The only obligations upon reserve board members were to maintain their job proficiency, to pass a physical examination and to return to fully-compensated active duty upon 30 days notice.

Reserve board members were also permitted to hold a second job without offset for the outside earnings. Article IV(1)(h) of the agreement provided, however, that the compensation of an employee on the reserve board who was eligible for a full annuity under the Railroad Retirement Act would be reduced by the amount the employee could have received from Railroad Retirement. It is this provision of the agreement which Barchers alleges violates the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634.

Barchers was eligible for the reserve board when it first became an available option on October 1, 1987. In fact, as the most senior employee, Barchers was guaranteed a position on the reserve board if he applied for it. Barchers chose not to join the reserve board and, instead, retired on September 28, 1988. Therefore, no Article IV(1)(h) deductions were ever made from Barchers' pay.

## DISCUSSION

Congress has provided that "[a]ny person aggrieved" may bring a civil action for violation of ADEA. 29 U.S.C. § 626(c)(1). The requirement has been construed "to define standing as broadly as is permitted by Article III of the Constitution." *Hackett v. McGuire Bros., Inc.*, 445 F.2d 442,

446 (3d Cir.1971). Of course, the requirement of a "case or controversy" is the jurisdictional touchstone of Article III, and for a "case or controversy" to exist, the plaintiff in a lawsuit in federal court must have standing to sue. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975).

■ When an employer's discriminatory practices deter a plaintiff from applying for a job or promotion, the plaintiff's failure to apply formally for the position is not "an inexorable bar to [relief]." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 364, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977). "When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application." *Id.* at 365–66, 97 S.Ct. at 1870.

The reason for allowing nonapplicants to make claims of illegal employment discrimination is simple:

> The denial of Title VII relief on the ground that the claimant had not formally applied for the job could exclude from the Act's coverage the victims of the most entrenched forms of discrimination. Victims of gross and pervasive discrimination could be denied relief precisely because the unlawful practices had been so successful as totally to deter job applications from members of minority groups. A per se prohibition of relief to nonapplicants could thus put beyond the reach of equity the most invidious effects of employment discrimination—those that extend to the very hope of self-realization.

*Teamsters,* 431 U.S. at 367, 97 S.Ct. at 1870–71. Thus, a nonapplicant has standing to challenge the employer's hiring practices (or a nonapplicant for a promotion has standing to challenge the promotion practices).

While a plaintiff's refusal to subject herself "to the humiliation of explicit and certain rejection" is not a complete bar to her challenge of an employer's employment practices, the right to challenge those practices is limited to challenging *hiring* practices. In such cases, one of the critical inquiries into the reason for the plaintiff's failure to apply is whether applying would have been "fruitless." *Williams v. Anderson,* 562 F.2d 1081, 1098 (8th Cir. 1977) (remanding to district court to determine "whether Anderson failed to apply for an administrative position because it would be fruitless"). When applying for a position would *not* be a "futile gesture," a nonapplicant's challenge will fail.

Admittedly, an employer could utilize discriminatory employment policies but neutral hiring practices to deter applications from a particular ethnic, gender or age group. The courts, however, have not cast the net of standing so broadly as to include nonapplicants challenging employment practices of an employer who would not have discriminated against the nonapplicants at the hiring stage. Policies applied to employees but not to applicants are beyond the pale of practices which nonapplicants may challenge.

■ In the present case, Barchers would like to analogize his own situation to that of plaintiffs who—due to discriminatory policies of employers—were deterred from applying for a job or promotion. Unlike those plaintiffs, however, Barchers' application for reserve board status would not have been a "futile gesture," and he would not have been subjecting himself "to the humiliation of explicit and certain rejection." Moreover, he is not challenging the board-status-selection practices; he is challenging a practice applied only to those who became reserve board members. His situation is in reality analogous to the nonapplicant who wishes to challenge an employer's policies unrelated to hiring or promotion. This he cannot do.

The parties agree that the only reason Barcher did not attain reserve board status was because he never applied for it; if he had applied, his acceptance was a foregone conclusion. Therefore, assuming without deciding that the pension policy applied to reserve board members did violate ADEA, it was never applied to this plaintiff. Plain-

tiff did not refrain from applying for a position on the reserve board in order to avoid "the humiliation of explicit and certain rejection." Plaintiff has therefore suffered no injury-in-fact and lacks standing to challenge the reserve board policies. Accordingly, it is hereby

ORDERED that plaintiff's complaint is DISMISSED for lack of subject matter jurisdiction.

IT IS SO ORDERED.